# Illinois Official Reports

## Appellate Court

---

### *People v. Woods*, 2021 IL App (1st) 190493

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CAROLINE WOODS, Defendant-Appellant. |
| District & No. | First District, Third Division<br>No. 1-19-0493 |
| Filed | September 22, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-CR-16436(01); the Hon. Timothy Joseph Joyce, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Douglas R. Hoff, and Matthew M. Daniels, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Janet C. Mahoney, and David H. Iskowich, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE McBRIDE delivered the judgment of the court, with opinion.<br>Presiding Justice Gordon and Justice Ellis concurred in the judgment and opinion. |

¶ 1      Following a jury trial, defendant Caroline Woods was convicted of two counts of aggravated battery based on the striking and burning of Z.W., born October 22, 2008. Defendant and codefendant Andrew Richardson were tried separately and simultaneously, with defendant by a jury and Richardson by the trial court. The trial court subsequently sentenced defendant to two consecutive terms of 25 years, for an aggregate term of 50 years.

¶ 2      On appeal, defendant argues that the trial court (1) abused its discretion when it denied her request for a jury instruction on the lesser-included offense of aggravated battery of a child involving bodily harm and (2) incorrectly instructed the jury on accountability.

¶ 3      The evidence presented at defendant's September 2018 jury trial disclosed the following.

¶ 4      Mason Arion was walking his dog at a park near 4800 South Lake Shore Drive in Chicago at around 10 a.m. on October 2, 2016. He noticed a young male child "sort of jogging" north along Lake Shore Drive. He explained that the child was "sort of jogging" because the child was "sort of limping" and did not appear to be able to run at full speed. He observed the child for "a little bit" because he did not want to scare him into the road. As he caught up to the child, Arion approached him and asked where he was going and where he was coming from. Arion observed scars and bruises on the child's face, arms, and legs. A minute or two later, a police officer arrived at the location. Arion did not learn the name of the child. After the officer arrived, he provided his information to the officer and told the officer what he had observed. Arion identified a photograph of the child in open court.

¶ 5      Sergeant Troy Williams was working on October 2, 2016, as a patrol sergeant, in uniform and driving a marked patrol car. His uniform included a body camera. Shortly before 11 a.m., he heard a radio call of "an approximately seven-year-old running northbound on Lake Shore Drive" near 47th and 48th Streets. It was not typical for a sergeant to respond to routine calls on the radio, but because of the nature of the call, he went to the scene. He drove to the area near 47th Street and Lake Shore Drive, which had a playground and baseball fields. As he approached the area, Arion raised his hand to get Sergeant Williams's attention. He spoke with Arion and then with the child, whom he identified as Z.W. Sergeant Williams observed facial scars and bruises as well as a limp. He also noted what appeared to be a diaper protruding from Z.W.'s waistband.

¶ 6      Z.W. told Sergeant Williams that he "just wanted to go to the park." The sergeant asked Z.W. about the observed injuries, and Z.W. told him that they were "punishment wounds from his parents." Sergeant Williams asked who his parents were, and Z.W. answered "Caroline," "Carol," and "Richardson." Z.W. showed Sergeant Williams a burn wound or scar on his back and told him that he had been placed on a stove by his father "Richardson." When the sergeant asked Z.W. where he lived, Z.W. pointed at two buildings south of where they were, 4800 South Chicago Beach Drive.

¶ 7      Sergeant Williams notified the dispatcher that he found the child and called for the fire department because of the child's condition. An ambulance was sent to the scene, and the paramedics examined Z.W. He also spoke with his lieutenant, Jacob Alderden. Officer Frances Frye also arrived at the scene. Sergeant Williams directed the ambulance to 4800 South Chicago Beach Drive, and he relocated to that location as well to help find out where Z.W. lived. Officer Mandy Tucker also arrived at the scene.

¶ 8        Z.W. initially led the officers into the north building. Officer Tucker's body camera was on and operating at this time, and Sergeant Williams turned on his body camera as well. They went up to the twenty-sixth floor, and Z.W. went to an apartment, turned the knob, and then knocked. No one answered the door. The officers knocked on a couple other doors and determined that Z.W. did not live on that floor. They returned to the lobby. Sergeant Williams spoke with the doorman while Z.W. returned to the ambulance. As he was standing in the lobby, a woman entered with a baby. Sergeant Williams learned her name was Caroline Woods, and he identified her as the defendant in open court. He had a conversation with defendant in the presence of Officer Tucker, and defendant was placed in custody at the scene. Sergeant Williams estimated that he had been with Z.W. for about 20 to 30 minutes before defendant entered the lobby. During his conversation with defendant, she told Sergeant Williams that Z.W. was injured in a car accident and from falling down the stairs. She also told him that Richardson treated Z.W. very well.

¶ 9        Officer Frances Frye was working on October 2, 2016, as a uniformed patrol officer in a marked vehicle. Shortly before 11 a.m., the officer heard a call over the police radio of a child running northbound around the 4800 block of South Lake Shore Drive. Officer Frye proceeded to that location and observed Sergeant Troy Williams with a child, Z.W., as well as Arion. He observed that Z.W. "looked battered" and had bruises "all over his body," including on his face and arms. After speaking with Sergeant Williams, Officer Frye tried to determine where Z.W. lived. Z.W. pointed to a building that was part of multiple residential high-rise buildings. He went into the lobbies of multiple buildings to ask security and the doormen if they knew Z.W. He was unable to locate Z.W.'s residence, but other officers located Z.W.'s building.

¶ 10       Officer Mandy Tucker responded to a call on October 2, 2016, to assist in the scene at 4800 South Chicago Beach Drive. When she arrived, Sergeant Williams and Lieutenant Alderden were with Z.W. Officer Tucker was in uniform with a body camera, which she activated when she arrived at the location. She went with officers to the twenty-sixth floor of the north tower to look for Z.W.'s apartment. She later returned to the lobby and was with Sergeant Williams when defendant entered the lobby with a little girl. Officer Tucker identified defendant in open court. She was present, and her body camera was recording, while Sergeant Williams spoke with defendant. The videotape of the body camera footage was admitted into evidence and played for the jury.

¶ 11       Defendant told Officer Tucker that she went to throw garbage out and, when she returned, Z.W. was not there. She also said that Z.W. was in a car accident five or six years ago and that he fell down the stairs. Officer Tucker did not observe any bruises on defendant. Defendant told her that she used to have a fiancé who was not abusive and treated Z.W. very well. Defendant also said her aunt was abusive to Z.W. four years ago.

¶ 12       Lieutenant Jacob Alderden monitored the call that Sergeant Williams responded to of a child running along Lake Shore Drive on October 2, 2016. He spoke with Sergeant Williams and then went to the scene at 4800 South Chicago Beach Drive. He joined Sergeant Williams and other officers on the twenty-sixth floor of the north tower. He observed Z.W. and noticed "obvious injuries to his face." After the attempts to find Z.W.'s apartment were unsuccessful, he returned to the lobby, and defendant showed up with Z.W.'s sister. Lieutenant Alderden identified defendant in open court. Z.W. was in the ambulance, and Lieutenant Alderden went to speak with him. Z.W. told him that he was routinely beaten by his mother and father. Z.W. started to detail how he sustained the injuries, including which weapons were used. Lieutenant

Alderden stopped talking to Z.W. because he directed another sergeant to obtain a search warrant for defendant and Richardson's residence. He then resumed a conversation with Z.W., during which Officer Jaime Garcia-Okon was present. Officer Garcia-Okon was wearing a body camera, and the conversation was recorded. Z.W. told the lieutenant that he last attended school for prekindergarten and was enrolled in home school. The recording of the conversation was played during the trial.

¶ 13    During the recorded conversation, Z.W. told the officers that defendant and Richardson hit him with a baseball bat, belt, vacuum, and a metal bottle. Richardson burned him by holding him over a hot stove. Z.W. said that he was not fed when Richardson was out of town.

¶ 14    Later that evening, around 7:30 p.m., Lieutenant Alderden returned to 4800 South Chicago Beach Drive to execute a search warrant with several other officers, including Sergeant Williams and Officer Garcia-Okon, on Richardson and defendant's residence. Lieutenant Alderden observed a small closet with a radio, suitcase, three empty cans of okra, two water bottles, a fork, and a hanging cord. The closet also smelled strongly of urine. He also observed a television monitor that was attached to a closed-circuit security system, which included cameras from the closet and the living room. A recording from the body camera of Sergeant Kochanny, who participated in the search warrant execution, was admitted into evidence and played before the jury.

¶ 15    Officer Jerry Doskocz was employed as an evidence technician with the Chicago Police Department and was assigned to assist in executing the search warrant at 4800 South Chicago Beach Drive. He photographed and inventoried several items from the apartment, including a black wooden baseball bat, a black belt, a hair straightener, a vacuum cleaner with a black attached hose, a metal starch can, and a white power strip. He also photographed the security system throughout the apartment with cameras in the closet and living room, a small television with the camera feed, and a hard drive.

¶ 16    Detective Brian Boeddeker was assigned to investigate the child abuse of Z.W. on October 2, 2016. He went to Comer Children's Hospital and met with Z.W. in the emergency room with another officer and an evidence technician present. He observed visible injuries on Z.W. During the interview, Z.W. identified Richardson from a photograph as his dad.

¶ 17    Z.W. described the abuse he suffered. He told the detective that his mother and father hit him on the feet with a black baseball bat. His father burned him on the kitchen stove. His mother and father beat him about the head and the back of neck with a black belt. Detective Boeddeker observed a bandage on the right side of Z.W.'s face as well as a sore or an injury to the bridge of his nose and other injuries in different stages of healing and scarring all over his head. Z.W. said he received the injury above his eyebrow when his father hit him with a metal spray bottle a few weeks earlier. Detective Boeddeker also observed injuries to Z.W.'s genital area, including an injury to the left side of Z.W.'s penis from when Richardson burned his penis with a black curling iron. Z.W. told the detective he received injuries from multiple items, including a vacuum cleaner hose, electrical cords, a belt, a black baseball bat, the stove, and a black curling iron.

¶ 18    Z.W. also discussed his living situation. He lived with Richardson, defendant, and his sister H.W. in an apartment. His parents slept in a bedroom, and a crib for H.W. was kept in the same bedroom. Z.W. slept in a closet next to the bathroom. He did not have a bed but slept on the floor. Z.W. stated that he was in the closet all day every day. Z.W. ate canned okra and drank water and protein drinks. Z.W. did not know how often he ate but said it was usually light

outside when he was able to eat food. Z.W. was sometimes allowed to use the bathroom, but if he was not let out of the closet, he had to go to the bathroom in the closet.

¶ 19 Z.W. told Detective Boeddeker that on October 2, 2016, he wanted to leave the apartment to tell the police that his mother and father were being mean to him. He knew that his parents were not home. He stated that his mother installed a video camera inside his closet that was pointed at him. Both Richardson and defendant showed Z.W. their cell phones, which showed images of him from the camera, and Z.W. knew that his parents could watch him at any time.

¶ 20 As part of his investigation, Detective Boeddeker attempted to find Richardson. After speaking with someone in Country Club Hills, Illinois, he received a phone number with a Los Angeles area code. He then obtained an arrest warrant for Richardson. He subsequently learned that Richardson had been arrested on the warrant on October 11, 2016, in Los Angeles. On October 18, 2016, Detective Boeddeker flew to Los Angeles to take custody of Richardson and bring him to Illinois. The detective identified Richardson in open court.

¶ 21 Alison Alstott was a forensic interviewer supervisor for the Chicago Children's Advocacy Center in October 2016 and was assigned to interview Z.W. on October 3, 2016, at Comer Children's Hospital. During the interview, detectives, an individual from the Department of Children and Family Services (DCFS), and an assistant state's attorney were present behind a curtain to observe. Z.W. was introduced to these individuals and was aware they were listening on the other side of the curtain. No one other than Alstott asked questions during the interview. The interview was recorded, admitted into evidence, and played for the jury. In the interview, Z.W. discussed his injuries and how they were caused by Richardson and defendant, which were generally consistent with his description of his injuries to the police officers.

¶ 22 Gabrielle Aranda works as a social worker at Comer Children's Hospital pediatric emergency room. On October 2, 2016, she was working and met with Z.W. According to Aranda, Z.W. was wearing a soiled diaper held together with duct tape. He had abrasions above his right eyebrow, on the bridge of his nose, on the left side of face, the back of his left ear, and on his back. He also had old scars over his entire body.

¶ 23 Z.W. told her he lived with Richardson, defendant, and his sister. He said the abrasions on his face occurred when he was struck with a bottle by Richardson. Aranda indicated that Z.W. had an open lesion on his back that Z.W. received when Richardson placed him on the stove. Z.W. also said Richardson burned the back of his ear and his genitals. Z.W. told her that defendant beat him with a pole, which left marks on his body.

¶ 24 Z.W. explained that he left his residence that day for two reasons: he wanted to play in the playground, and he wanted to tell the police that Richardson was beating him every day. He told her that the last time he had eaten was lunch the previous day. He said he slept in a closet and was sometimes allowed to leave to use the restroom, but he was not allowed all the time, which was why he was wearing a diaper. Aranda identified photographs of Z.W. taken while he was in the emergency room. Z.W. told Aranda that Richardson and defendant had threatened to throw him out the window and, on numerous occasions, they told him that they wanted him dead.

¶ 25 Dr. Veena Ramaiah is a pediatric emergency room physician and child abuse pediatrician at Comer Children's Hospital. On October 2, 2016, she received a call from the pediatric emergency room social worker informing her about a child with high concerns of abuse or neglect. Dr. Ramaiah examined Z.W. on October 3, 2016. Z.W. was seven years old at the time of the examination. He was walking around and interactive. Dr. Ramaiah identified

photographs taken of Z.W. either in her presence or in the emergency room the day before. She described Z.W.'s injuries, both healed and scarred, in the photographs, including on Z.W.'s face, neck, collarbone, shoulder, chest, abdomen, arms, legs, thighs, groin, and penis. Dr. Ramaiah testified that the burn on Z.W.'s back went through multiple layers of skin. She also stated that tests indicated an issue with Z.W.'s liver, but a computed tomography scan was negative. Dr. Ramaiah stated that the elevated liver enzymes could have indicated an old injury to his liver. A skeletal survey of X-rays of Z.W.'s body was conducted. The X-rays showed that toes on Z.W.'s feet had been broken weeks to months earlier but were healing. The X-ray of Z.W.'s left femur showed healing around a fracture or break of the bone that occurred weeks earlier. According to Dr. Ramaiah, the healing femur could be the cause of Z.W.'s limp. Dr. Ramaiah testified that to break the femur of a seven-year-old child would require "a significant amount of force" because it is a "very thick" and "strong" bone.

¶ 26     When asked if she was able to count the number of scars and injuries Z.W. had, Dr. Ramaiah responded, "No, there were too many." Dr. Ramaiah's medical diagnosis of Z.W. was physical abuse and a victim of torture, the first time she had diagnosed torture.

¶ 27     Z.W. testified that he was born on October 22, 2008, and was nine years old at the time of the trial. He was in the fourth grade. He identified Richardson and defendant in open court. Z.W. lived with them in three places. He lived in the yellow house from when he was a baby until he was four years old and lived there with defendant and defendant's grandmother. Later, Richardson moved in with them. After defendant's grandmother passed away, he moved to the blue house and lived with Richardson, defendant, and Richardson's father. Z.W. was four years old when they moved to the blue house. Z.W.'s sister H.W. was born when they lived in the blue house. After Richardson's father died, they moved from the blue house to an apartment in Chicago when he was six years old.

¶ 28     While he lived in the yellow house, Richardson would hurt him by tying him up to a bed, and then Richardson hit Z.W. on the back with a baseball bat. Richardson also hit Z.W. with a wire and a belt. No one else hurt him when he lived in the yellow house. Richardson did the same things to hurt Z.W. when they lived in the blue house. No one else hurt him when he lived in the blue house.

¶ 29     In the apartment, Z.W. slept in the closet. The door could be locked, and Richardson or defendant would tie Z.W.'s hand behind his back to a rope that was hanging from a metal bar. He was sometimes allowed to use the bathroom. If he was not allowed to use the bathroom, he would try to hold it. He had to wear diapers. He ate okra and water in the closet. There was a camera in the closet so they could "keep an eye on" him.

¶ 30     Richardson hurt Z.W. when they lived in the apartment. Z.W. testified that Richardson put his face in the bathtub and toilet with water in it. Richardson also put a bag over his head. Richardson also picked him up and burned his face and back on the stove. Z.W. stated that he still had a scar on his back from the burn. Z.W.'s genitals were burned by defendant with a curling iron and the stove. Richardson and defendant put tape over his mouth when he tried to talk. Richardson hit Z.W. in the face with a bat while defendant hit his feet with the bat. He was also hit with a can in the head. He indicated that he had a scar above his left eyebrow.

¶ 31     On October 2, 2016, defendant tied Z.W. up to the rope in the closet because she had to go to the store. Richardson was in California. After defendant left with H.W., Z.W. was able to untie the knot and went on the elevator. He went outside and saw that he was one block behind defendant and H.W. He then went to the park and the man, Arion, with his dog found him and

called for help. Before that day, Z.W. had left the apartment one time to go shopping with defendant. He did not attend school and did not go to the doctor.

¶ 32 Ronnie Rush worked as a chief engineer for the Newport Condominiums, located at 4800 South Chicago Beach Drive, in October 2016. He was in charge of heating and cooling as well as fixing plumbing. He identified Richardson and defendant in court as residents from the building. He saw defendant almost every morning when she would leave the building around 8 or 9 a.m. with a baby girl in a stroller. He saw Richardson less frequently, maybe once or twice a week. The only time he saw Richardson and defendant together was in their unit.

¶ 33 In the summer of 2016, Rush was called to their unit to investigate a leak. He met Richardson in the hallway and entered the unit with him after Richardson knocked on the unit door. Defendant opened the door with H.W. in her arms. Rush observed a little boy on the couch. This was the first time Rush had observed the little boy. He identified Z.W. from a photograph in court as the little boy he observed. Rush noticed marks on Z.W.'s face, neck, and a little bit of his chest. Richardson sat on the couch very close to Z.W. Rush also noticed that Z.W. was holding a dog shock collar, which he described as black with little prongs coming out of it. Rush did not contact the police or building management about Z.W. because Richardson told him Z.W. was defendant's nephew that he had picked up because an aunt was sexually abusing the boy.

¶ 34 While he was inside the unit, Rush observed lots of cameras and a closet that was set for "sleeping quarters," with a pillow and a blanket on the floor. He also saw a strap hanging from the clothes rod. Rush had his lunch with him when he went into the apartment. Z.W.'s eyes "got like really big like he wanted some," so Rush then shared his juice and sandwich with Z.W.

¶ 35 On October 2, 2016, Rush received a call that there was a lost boy in the lobby and they were trying to find his unit. He went to the lobby, and as he was entering, he observed defendant coming in at the same time. He also saw Z.W. with the police.

¶ 36 Marsha Byndom lived in the condominium building located at 4800 South Chicago Beach Drive in Chicago during 2015 and 2016. There are two towers, a south tower and a north tower, attached by a lobby. She resided in the south tower. Byndom identified Richardson and defendant as residents of the building in 2015 and 2016. She observed defendant walking down the street, pushing a stroller with a little girl, and looking at her phone. She did not observe any other children with defendant. Byndom saw defendant "every day or so" but never observed another child with defendant. Byndom would see defendant and the little girl while Byndom was downstairs smoking. Byndom met Richardson when she first moved into the building, and he asked if she wanted him to be her personal trainer, but she declined. Richardson continued to ask, but she kept declining. She saw Richardson three or four times a week either coming into the building or on the rooftop deck.

¶ 37 In January 2017, Byndom went to the police station and gave a statement. She also identified both Richardson and defendant from photo arrays. Byndom never saw Z.W. while she resided in the building.

¶ 38 After the State rested, defendant moved for a directed verdict, which the trial court denied.

¶ 39 Defendant testified in her own defense. She grew up in Country Club Hills, Illinois, in the yellow house described by Z.W., with her mother, grandmother, and aunt. Defendant became pregnant with Z.W. when she was 16. Z.W.'s father was defendant's high school boyfriend.

- 7 -

Defendant met Richardson in August 2012 when Z.W. was almost four years old. She began dating Richardson, and the relationship lasted until 2016. Richardson proposed to her after two months, but defendant initially declined. When he proposed a month later, defendant accepted. Richardson moved into the yellow house in November 2012 with defendant, Z.W., her grandmother, her aunt, and her cousin.

¶ 40    Around November or December 2012, there was an allegation that defendant's aunt was sexually abusing Z.W. Defendant called the police, DCFS became involved, and a protection order was entered against her aunt. Her aunt and cousin then moved out of the house. Defendant's grandmother passed away in July 2013, and they moved to Richardson's father's house, described by Z.W. as the blue house. They lived there for approximately a year-and-a-half. Richardson worked as a personal trainer and supported them. Defendant did not have a job but received welfare. H.W. was born in January 2014.

¶ 41    Defendant testified that Richardson was "very good" with Z.W. She did not observe him strike Z.W. while they lived in the yellow house. While living in the blue house, defendant observed Richardson hit Z.W. in the back of head, which caused the child to stumble. She told Richardson not to hit Z.W., and Richardson said okay. Later when Z.W. broke something of importance to Richardson, he struck Z.W. with a belt. Defendant jumped in and told Richardson to stop. Defendant admitted that she would spank Z.W. on his bottom and hit the back of his head with her hand because Z.W. was either being too aggressive or misbehaving.

¶ 42    Richardson's father passed away in March 2015, and they then moved to the apartment in Chicago. When they moved into the apartment, Richardson set up cameras in the apartment, including two in the living room. Richardson continued to work as a personal trainer but did not have a consistent schedule. Defendant did not have a relationship with anyone in her family, and she did not make any friends when she moved into the apartment. Defendant decided to homeschool Z.W. in late 2013 after the school reported that Z.W. was too aggressive with other children. Defendant would take Z.W. and H.W. to the park and a recreation center when Richardson was not home. The whole family, including Richardson, never went out together while they lived in the apartment.

¶ 43    When they moved to the apartment, Richardson was often "agitated" with Z.W. and would yell at Z.W. for little things. Defendant described her relationship with Richardson as "tense." When they first moved into the apartment, defendant and H.W. slept in the bedroom, and Z.W. slept on the couch. Richardson sometimes slept in the bedroom and sometimes on the couch. Z.W. had problems wetting the couch while he slept, so they bought an air mattress for him. Richardson struck Z.W. while they lived in the apartment. He also began to punch or grab defendant. He pushed her to the ground and told her she was "worthless and nothing." Her relationship with Richardson worsened, and he became more violent toward her, and she was afraid of him. He would monitor her movement from the cameras and call her if she left the apartment to ask where she was going and told her to go home as soon as possible. She did not find out that Richardson had married someone else in October 2015 until around September 2016. She has never met this person. Richardson told her that he only married this woman for her money and she was very sick. When defendant said she did not believe him, Richardson grabbed her arms and told her she had to believe him. Defendant told him to let her go, and then he punched her in the nose.

¶ 44    Defendant observed Richardson hit Z.W. with a belt and his hand, but nothing else. She admitted to hitting Z.W. with a belt and hose attachment from a vacuum cleaner. According to

defendant, if she noticed a scratch or gash on Z.W. and recommended taking him to the hospital, Richardson would "beat" her. She did not discover the scars on Z.W.'s stomach until long after it happened, around July or August 2016. She observed Z.W. in the shower and confronted Richardson. Richardson told her that Z.W. was misbehaving so he punished him. Defendant yelled at Richardson, and he punched her in the face. Defendant did not leave Richardson because she had nowhere to go and no money to support the children. She did not call the police because she did not expect them to help and thought they would blame her. She did not tell the police the truth the day Z.W. ran away because she was afraid. She admitted that Z.W. did not fall down the stairs. Richardson had previously told her to tell people that Z.W. was in a car accident or fell down the stairs. Richardson had become more violent toward Z.W., and she would see new marks on his body. Richardson told her he threw a book at Z.W. and it "accidentally" hit him in the face, causing a gash on Z.W.'s nose. She did not remember having a shock collar in the apartment.

¶ 45    She denied that Rush let her into the building every day. She also did not recognize Byndom from the building. She also denied leaving the apartment every day with H.W. Z.W. had not left the apartment in the two weeks before he ran away because of a gash on his forehead. On the morning of October 2, 2016, she left the apartment with H.W. to throw a blanket away in the dumpster downstairs because Z.W. had vomited on it. Z.W. was asleep on the couch when she left.

¶ 46    Defendant had Z.W. eat okra in the closet because he was spilling it on the floor. Everyone in the apartment ate okra because Richardson said it was supposed to help with weight. Everyone also drank protein shakes. Z.W. also ate spaghetti, macaroni and cheese, hamburgers, and pizza. Z.W. began sleeping in the closet around four to five months after they moved into the apartment because Z.W. continued to have issues wetting the bed. It was Richardson's idea. She denied that the closet had a lock from the outside. Initially, Z.W. only slept in the closet because of the bedwetting issue, but then Richardson said Z.W. needed his own room, referring to the closet. She admitted they were being evicted from the apartment. Richardson took multiple trips to California, and while he was away, she let Z.W. sleep on the couch. When Richardson observed Z.W. on the couch from the camera, he would become mad and call her. When he returned, he would make Z.W. go back to the closet and would beat defendant.

¶ 47    Defendant denied ever hitting Z.W. with a bat, burning him on the stove or with a curling iron, tying him up, putting his head in a toilet or tub of water, putting a bag over his head, or threatening to throw him out of the window or that she wanted him dead. She knew that Z.W. had a scar on his penis but did not know he had been injured in his genitals. She claimed she did not know Z.W. had broken his femur because she thought he had walked "funny to begin with" and was "pigeon-toed." She admitted to telling Sergeant Williams that Z.W. was burned on his back when he fell out of the shower and onto a curling iron.

¶ 48    The defense then rested. During the jury instruction conference, defendant objected to the State's proposed instructions regarding accountability. Instruction 14 was the pattern instruction for accountability, while instructions 15 and 16 stated propositions 1 and 2 from the Committee Notes. Illinois Pattern Jury Instructions, Criminal, No. 5.03 (approved Oct. 28, 2016) (hereinafter IPI Criminal No. 5.03). The trial court agreed to give the instructions over defendant's objection. Defendant then requested to instruct the jury on the lesser-included offense of aggravated battery causing bodily harm, which the trial court denied.

¶ 49 Following closing arguments, the jury found defendant guilty of four counts of aggravated battery of a child and that the offenses were accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty. At sentencing, the court sentenced defendant to two consecutive terms of 25 years, for an aggregate term of 50 years in prison, for aggravated battery of a child based on great bodily harm. The court merged the counts of aggravated battery of a child based on permanent disfigurement into the counts of aggravated battery of a child based on great bodily harm.

¶ 50 This appeal followed.

¶ 51 Defendant raises two issues on appeal. We first consider defendant's claim that the jury received contrary and conflicting instructions on accountability. Specifically, defendant asserts that the instructions provided conflicting mental states and deprived her of a fair jury trial. The State maintains that the trial court properly instructed the jury on accountability principles.

¶ 52 "The function of the instructions is to convey to the jurors the correct principles of law applicable to the facts so that they can arrive at a correct conclusion according to the law and the evidence." *People v. Williams*, 181 Ill. 2d 297, 318 (1998). "It is the trial court's burden to insure the jury is given the essential instructions as to the elements of the crime charged, the presumption of innocence, and the question of burden of proof." *Id.* The giving of jury instructions is generally reviewed for an abuse of discretion; when the question is whether the jury instructions accurately conveyed to the jury the law applicable to the case, the review is *de novo*. *People v. Pierce*, 226 Ill. 2d 470, 475 (2007).

¶ 53 The trial court instructed the jury from IPI Criminal No. 5.03 on the theory of accountability:

"A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of an offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of an offense.

The word 'conduct' includes any criminal act done in furtherance of the planned and intended act."

¶ 54 In addition, the Committee Note for IPI Criminal No. 5.03 sets forth additional instructions "modified by the Committee to be consistent with style, language and form of IPI-Criminal Instructions":

"(1) A parent has a legal duty to aid a small child if the parent knows or should know about a danger to the child and the parent has the physical ability to protect the child. Criminal conduct may arise by overt acts or by an omission to act where there is a legal duty to do so.

(2) Actual physical presence at the commission of a crime is not a requirement for legal responsibility." IPI Criminal No. 5.03 Committee Note.

¶ 55 Both additional instructions were given to the jury over defendant's objection. Defendant contends that the first additional instruction misstated the *mens rea* element of accountability because the instruction told the jurors that defendant could be held accountable if she did not know, but should have known, that Richardson was abusing Z.W.

¶ 56 The additional accountability instructions concern parental accountability and originate from the supreme court's decision in *People v. Stanciel*, 153 Ill. 2d 218 (1992). In that case, the supreme court considered the consolidated appeals of two mothers, each of whom was held

accountable for the murder of her child by a live-in boyfriend. The *Stanciel* court held that the mother's knowledge of ongoing abuse by her boyfriend, coupled with the continued, sanctioned exposure of the child to the abuse, was sufficient to hold the mother accountable for the murder of the child. *Id.* at 237. The supreme court pointed out that it had long recognized the affirmative duties of parents to protect their small children from threats by third persons. *Id.* at 236. The court found that, while the mothers did not aid the principals in the pattern of abuse that resulted in the deaths of the children, the evidence presented against the mothers was sufficient "to provide the inference that they both either knew or should have known of the serious nature of the injuries which the victims were sustaining." *Id.* at 237. The court held that, under the circumstances presented, "the defendants had an affirmative duty to protect their children from the threat posed" by the perpetrators and, rather than fulfilling the duty, the defendants entirely ignored the dangers and thereby aided the perpetrators in murdering the children. *Id.* The supreme court specifically concluded that intent remained a requirement of accountability and that guilt must be proven through the knowledge and sanction of a danger. *Id.*

¶ 57　　Years later, the supreme court in *People v. Pollock*, 202 Ill. 2d 189 (2002), clarified the language in *Stanciel* regarding the *mens rea* required for parental accountability. In *Pollock*, the defendant was the mother of a three-year-old girl who was murdered by the mother's boyfriend. The boyfriend admitted that he had caused the child's death, and he told police that the defendant was unaware of his actions. *Id.* at 203. The defendant was convicted of first degree murder and aggravated battery of a child based on the sole theory of accountability. *Id.* at 209. During the trial, there was no evidence that the defendant abused her child. In addition, there was no evidence that the defendant was present when her child was abused or was aware of any abusive acts committed by her boyfriend. Throughout opening and closing statements, the State repeatedly argued that the defendant "knew or should have known" about the abuse committed by her boyfriend and that, by allowing the boyfriend to have access to the child, the defendant was accountable for his actions. *Id.* at 206-07. Relying on language from *Stanciel*, the State tendered the following nonpattern instruction, which the trial court allowed and read to the jury: " 'A parent has a legal duty to aid a small child if the parent knows or should have known about a danger to the child and the parent has the physical ability to protect the child.' " *Id.* at 208. The jury subsequently found the defendant guilty of felony murder and the predicate felony, aggravated battery of a child. *Id.* at 209. At sentencing, the trial court stated, " 'The finding of guilty was based not upon her own direct action, but upon her failure to act to protect her child from the actions of her live-in boyfriend.' " *Id.*

¶ 58　　On appeal to the supreme court, the defendant argued that, in order for her to be held accountable for the predicate felony, the jury was required to find beyond a reasonable doubt that she possessed a knowing or intentional state of mind, but the nonpattern parental accountability instruction and the State's argument misstated the required *mens rea* by informing the jury that it could find her guilty if she did not know of the abuse but should have known. *Id.* at 209-10. In addressing the defendant's argument, the supreme court stated that it was a misconstruction of *Stanciel* to assert that a parent's legal duty to protect his or her child may be imposed if the parent does not know, but should know, of a danger. *Id.* at 215. The court explained that the term "knew or should have known" as used in *Stanciel* was in reference to the mother's awareness of the severity of the injuries sustained by her child, not the mother's awareness of the existence of the abuse. *Id.*

"Rather than diluting the knowing or intentional *mens rea* requirement for accountability, *Stanciel*, instead, stands for the proposition that when proof that a parent aided and abetted an offense is to be deduced from an omission to act, the parent must know of a serious and immediate threat to the welfare of the child. That is, there must be evidence from which it can be inferred that the parent knew that the child was sustaining injury and, based on the severity of the injuries being sustained, knew that there was a substantial risk that death or great bodily harm would result if the parent did not act to protect the child." *Id.*

¶ 59   The *Pollock* court further reasoned:

"In sum, we conclude that a parent may not sit idly by while another person abuses her child. Parents are required to intercede on their child's behalf and, if they fail to act, they risk being held responsible for the other person's criminal conduct. By failing to act, the parent may be deemed to have implicitly sanctioned the criminal behavior and, therefore, may be held accountable for the abusive conduct. Even in situations where the parent is not present at the time when the abuse resulting in death takes place, the parent may be held accountable for the criminal conduct resulting in death, if it is proved that the parent knew that the child had been abused by the principal in the past and, because of the nature of previous injuries sustained by the child, also knew there was a substantial risk of serious harm, yet took no action to protect the child from future injury by the abuser." *Id.* at 215-16.

¶ 60   Under the facts of that case, the supreme court found that the law of accountability was misstated in the instruction and in the State's repeated argument that the defendant could be found guilty if she did not know, but should have known, that her boyfriend was abusing her child. *Id.* at 216. The court concluded that the error was not harmless because the State's case was exclusively premised on the defendant's accountability. *Id.*

¶ 61   During the jury instruction conference in the present case, defense counsel directed the trial court to the decision in *Pollock*. In its ruling, the court distinguished the circumstances here from those in *Pollock* and found:

"Here's what I'm not going to instruct in this matter, and I'll tell you why. And the reason is because in *Pollock*, that was a scenario where there was evidence by which it was possible that the defendant did not know of the purported abuse by the other person. By virtue of Ms. Woods' testimony, it is clear that Ms. Woods did know. So I don't think taking the, should know, out is appropriate in this [case] because Ms. Woods acknowledged by virtue of her testimony that she did know. So unlike Pollock where there was purportedly an instance where the instructions had the potential effect to put criminal liability upon a person who, A, might not have known and perhaps could not have known, that's not the scenario that we have here on the evidence. That's why I'm not going to give this, over your well-stated objection—why I'm not going to change that instruction over your well-stated objection."

¶ 62   As the trial court observed, the evidence in this case overwhelmingly established that defendant was aware of the injuries sustained by Z.W. and inflicted by Richardson. In her own testimony, defendant recounted how she treated the wounds and gashes left on Z.W.'s body after Richardson harmed him. Further, while defendant denied being present in the room when Richardson burned Z.W. on the stove, she admitted to observing the injury and scars on Z.W.'s back. She knew the abuse of Z.W. was ongoing and conceded that she did not leave with Z.W.

- 12 -

or contact anyone for help. As the supreme court held in *Pollock*, the phrase "should have known" in the instruction refers to defendant's awareness of the severity of Z.W.'s injuries. In contrast with *Pollock*, defendant was fully aware of the abuse and injuries inflicted on Z.W. and either knew or should have known the severity of those injuries. Moreover, unlike in *Pollock*, defendant was tried for both her own actions as a principal and under the accountability theory for Richardson's actions. In *Pollock*, no evidence was introduced showing that the defendant had committed any acts of physical abuse. The defendant there was accountable for her omissions, her failure to act when she found small bruises a few days before her daughter died and failed to act. Here, Richardson's abuse of Z.W. continued over months and years, with much of the abuse known by defendant, who did nothing to protect Z.W.

¶ 63    Additionally, unlike in *Pollock*, the prosecutor in this case only referred to the instruction once during closing arguments when she read the instruction to the jury.

> "His Honor will also instruct you that actual physical presence at the commission of a crime is not a requirement for legal responsibility. And most importantly in this case, His Honor will tell you that a parent has a legal duty to aid a small child if the parent knows or should know about a danger to the child, and the parent has the physical ability to protect the child. Criminal conduct may arise by overt acts or by omission to act where there is a legal duty to do so.

> Ladies and gentlemen, Caroline Woods not only inflicted harm—great bodily harm—to [Z.W.] herself, but she stood by and moved three times with the person who was doing it to her son: Her paramour. And she did nothing. She not only didn't aid [Z.W.]—because, frankly, Neosporin on a cut that needed stitches isn't aid—she facilitated it. She ignored it, and she did nothing. She did nothing to stop it. She did nothing to help [Z.W.] She did not call anyone. She did not go to the police. She did absolutely nothing. She is legally responsible for every wound on that boy's body. She is legally responsible for every time that not only did she do something, but every single time Andrew Richardson did something to that boy. It's just as though she did it herself.

> When Andrew Richardson was holding him on that stove, melting away at his skin, causing those scars, it's just the same as though Caroline Woods—who was in the other room at the time—was doing it herself with her own hands. When he burned him, when he hit him with the bat, it's just as though that hair iron was in her hand. It's just as though that bat was in her hands. It makes no difference. She's responsible.

> The law recognizes that she had a duty to protect [Z.W.]—a duty that she failed; a duty that she not only didn't account for, she did everything to prevent [Z.W.] from getting help from anybody else. She took him out of school so that nobody would see his injuries. She didn't take him out of the apartment when Andrew was gone. She put that camera outside of [Z.W.'s] closet. She's the one who was putting a diaper on him when Andrew was in California. She's the one who was keeping him in that closet when Andrew was in California. She's Andrew's partner in crime."

¶ 64    The prosecutor explicitly argued that defendant knew of Z.W.'s injuries and failed to act to protect Z.W. from Richardson. In *Pollock*, the supreme court observed that the State placed a "high degree of emphasis on the 'should have known' standard." *Pollock*, 202 Ill. 2d at 216. Here, as a clear distinction, the prosecutor only referenced that phrase once while reciting the language from the jury instructions and focused on defendant's actions that made her accountable for Richardson's abusive acts.

¶ 65       Moreover, the jury instructions make it clear that the State was never relieved of its burden of proof. The accountability and issues instructions do not state that defendant "knew or should have known," and neither minimized the requirement of a knowing mental state. As quoted above, the accountability instruction explicitly instructed the jury of the knowing mental state. As to the elements of aggravated battery of a child, the jury was instructed as follows.

> "A person commits the offense of aggravated battery of a child when he, being a person of the age of 18 years or more, knowingly and by any means causes great bodily harm or permanent disfigurement to any child under the age of 13 years.
>
> To sustain the charge of aggravated battery of a child, the State must prove the following propositions. First proposition: That the defendant, or one for whose conduct she is legally responsible, knowingly caused great bodily harm to [Z.W.]; and, second proposition, that when the defendant, or one for whose conduct she is legally responsible, did so, she was of the age of 18 years or older; and, third proposition, that when the defendant, or one for whose conduct she is legally responsible, did so, [Z.W.] was under 13 years."

Additionally, the State's burden of establishing defendant acted knowingly was repeated three more times for each specific charge of aggravated battery of a child. We find there was no confusion or inconsistency in the issues instructions. Thus, the jury was properly informed of the required mental state.

¶ 66       Defendant also relies on *People v. Burton*, 338 Ill. App. 3d 406, 414 (2003), for support. However, the *Burton* court's analysis was limited to a brief summary of *Pollock* and then a one-sentence holding: "In light of *Pollock*, we must reverse Burton's conviction and remand for a new trial." *Id.* The reviewing court did not engage in an analysis of its facts in comparison to *Pollock*. For this reason, we find this case offers little support for defendant's position.

¶ 67       As the supreme court reasoned in *Pollock*, "there must be evidence from which it can be inferred that the parent knew that the child was sustaining injury and, based on the severity of the injuries being sustained, knew that there was a substantial risk that death or great bodily harm would result if the parent did not act to protect the child." *Pollock*, 202 Ill. 2d at 215. The circumstances in this case satisfy this reasoning. Here, the evidence overwhelmingly established that defendant knew of the injuries Richardson inflicted on Z.W. and failed to take any action to protect her son. Z.W. was found limping along Lake Shore Drive and told multiple officers about the abuse he suffered by defendant and Richardson. Z.W. said that defendant hit his feet with a baseball bat, and medical evidence indicated his toes had been broken. He was observed with visible injuries and bruises and was wearing a soiled, duct-taped diaper. X-rays showed that Z.W.'s femur had been broken, but defendant admitted that she was unaware of the injury. Multiple burns were found on Z.W.'s body. He told the police that Richardson had burned his back on the stove. He also described being burned near his genitals and thigh by both defendant and Richardson with a curling iron. Z.W. described being forced to stay and sleep in a closet and being watched on cameras by Richardson and defendant. Defendant admitted that she knew Z.W. was sustaining injuries, and yet she did nothing. Significantly, she admitted that she failed to act to protect Z.W. while Richardson was away in another state. Based on the circumstances of this case, the trial court acted within its discretion to instruct the jury on defendant's parental accountability and no error occurred.

¶ 68    Finally, this is not simply a failure to act case as was *Pollock*; the State pursued and overwhelmingly established that defendant was a principal just as much as she was accountable for Richardson's acts.

¶ 69    Defendant next contends that the trial court abused its discretion and denied her right to a fair trial and to present a defense when it refused to instruct the jury on the lesser-included offense of aggravated battery causing bodily harm. Specifically, defendant contends that this was error because her testimony as well as some of the State's evidence provided a basis from which the jury could conclude that, while Z.W. suffered injuries consistent with great bodily harm, defendant was only culpable for injuries causing bodily harm. We dispose of this contention on several grounds.

¶ 70    First, the jury was instructed, and the State's evidence proved defendant guilty, under two separate theories: (1) as a principal, for the offense of aggravated battery of a child in that she knowingly caused great bodily harm and permanent disfigurement to Z.W., and (2) as an accomplice, for the offense of aggravated battery of a child in that she was accountable for Richardson's conduct, in both respects, causing great bodily harm and permanent disfigurement to Z.W. Here, defendant has not challenged that her convictions were supported by proof beyond a reasonable doubt under either or both theories. Similar to a general verdict, where the jury was not asked to determine whether defendant was guilty on a specific theory, we can therefore conclude that the jury found her guilty either as a principal or an accomplice or both. See *People v. Bobo*, 375 Ill. App. 3d 966, 978 (2007) (when the jury returned a general verdict form for aggravated kidnapping, the trial court could presume that the jury found the defendant guilty on both theories: he inflicted great bodily harm to the victim and he committed aggravated sexual abuse on her, and ample evidence was presented to support both theories).

¶ 71    Further, since defendant has conceded that Richardson's conduct, for which she was accountable, caused both great bodily harm and nothing less than great bodily harm, and permanent disfigurement to Z.W., the State did not have to prove defendant herself actually inflicted great bodily harm. And because the accountability theory was properly before the jury and the jury could have found defendant accountable for Richardson's acts, which caused great bodily harm and nothing less, defendant was not entitled to the instruction on the lesser-included offense of aggravated battery of a child causing "bodily harm." Accordingly, the trial court did not err in refusing defendant's request for this instruction.

¶ 72    Second, we can also conclude, based upon the evidence presented and the four separate verdict forms submitted to and returned by the jury in this case on the counts of aggravated battery of a child causing great bodily harm and/or permanent disfigurement, that not only could the jury find Woods accountable for all the acts committed by Richardson but the jury did find defendant guilty under an accountability theory for Richardson's conduct causing great bodily harm and/or permanent disfigurement.

¶ 73    We know this because of the evidence presented concerning Richardson's acts, the burning and the striking of Z.W. with a baseball bat, and by the four separate verdicts the jury returned against defendant, which found she was (1) guilty of aggravated battery of a child causing great bodily harm by burning Z.W., (2) guilty of aggravated battery of a child causing permanent disfigurement by burning Z.W., (3) guilty of aggravated battery of a child causing great bodily harm by striking Z.W. about the body, and (4) guilty of aggravated battery of a child causing permanent disfigurement by striking Z.W. about the body. Again, and because defendant has never challenged that Richardson's acts caused no less than great bodily harm and permanent

- 15 -

disfigurement to Z.W. and the jury found defendant accountable for Richardson's conduct, the trial court did not err in refusing to give the lesser-included offense instruction of aggravated battery of a child causing only "bodily harm."

¶ 74 We also add that challenging the instruction on accountability does not change or alter this fact, nor has defendant argued or suggested, in any way, that it has.

¶ 75 Nevertheless, even if the trial court erred in refusing the instruction, any error was harmless. See *People v. Amaya*, 321 Ill. App. 3d 923, 929 (2001) (an error in the jury instructions will not warrant a new trial unless the result of the trial would have been different had the jury been instructed properly). As discussed above, the evidence against defendant was overwhelming. Z.W. was found limping along Lake Shore Drive and told multiple officers about the abuse he suffered by defendant and Richardson. Z.W. said that defendant hit his feet with a baseball bat, and medical evidence indicated his toes had been broken. He was observed with visible injuries and bruises and was wearing a soiled, duct-taped diaper. Defendant admitted that she struck Z.W. with a belt and the hose from a vacuum. X-rays showed that Z.W.'s femur had been broken, but defendant testified that she never noticed the injury. Z.W. reported that Richardson had burned his back on the stove and he had been burned by his genitals and thigh with a curling iron. Defendant admitted that she discovered the burn marks on Z.W. but denied burning him herself. Defendant also admitted that Z.W. was forced to eat and sleep in the closet. Z.W. said that defendant tied him to a cord in the closet on the day he escaped, and a cord matching Z.W.'s description was discovered in the closet during a police search of the apartment. The police observed that the closet had empty okra cans and smelled strongly of urine. Police found a baseball bat and vacuum in the apartment that matched Z.W.'s description. Dr. Ramaiah was unable to count the scars and injuries on Z.W. because there were "too many." She also diagnosed Z.W. as a victim of torture, the first time she had diagnosed torture.

¶ 76 Therefore, if the trial court erred in the failing to give a lesser-included instruction, which we do not find, any error was harmless. Given the overwhelming evidence of defendant's guilt, the result of the trial would not have been different with the instruction of a lesser-included offense. See *id.*

¶ 77 Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 78 Affirmed.