2023 IL 127794

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

(Docket No. 127794)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
CAROLINE WOODS, Appellant.

*Opinion filed March 23, 2023.*

JUSTICE O'BRIEN delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Neville, Overstreet, Holder White, and Cunningham concurred in the judgment and opinion.

Justice Rochford took no part in the decision.

**OPINION**

¶ 1 Following a jury trial in the circuit court of Cook County, defendant Caroline Woods was convicted of four counts of aggravated battery of a child (720 ILCS 5/12-3.05(b)(1) (West 2016)). The jury also concluded that the State proved beyond a reasonable doubt that the aggravated battery was accompanied by exceptionally

brutal or heinous behavior indicative of wanton cruelty. Defendant's paramour and codefendant, Andrew Richardson, was found guilty of the same offenses. Defendant was sentenced to an aggregate term of 50 years in the Department of Corrections. On appeal, defendant challenged her convictions on the basis that, *inter alia*, the jury instructions on accountability and parental accountability were directly conflicting instructions. The appellate court affirmed defendant's convictions. 2021 IL App (1st) 190493. On appeal to this court, defendant argues that (1) jury instructional error on an essential element cannot be harmless error and (2) even if it could be harmless error, it was not in this case. We find that any conflict in the required knowledge element in the accountability instructions was harmless error because defendant's knowledge was not an essential element when defendant was proven guilty of aggravated battery of a child beyond a reasonable doubt as a principal. Thus, we affirm defendant's convictions.

¶ 2                                    BACKGROUND

¶ 3        Defendant and Richardson were jointly charged in a 27-count indictment for the abuse of defendant's son, Z.W. The State elected to proceed to trial on four counts. Count II alleged that both defendants committed aggravated battery of a child in that defendants, knowingly and without legal justification, caused Z.W. great bodily harm by striking Z.W. about his body. Count IV alleged aggravated battery of a child against both defendants but alleged that the battery caused permanent disfigurement. Counts V and VI alleged that both defendants committed aggravated battery of a child, knowingly and without legal justification causing Z.W. great bodily harm and permanent disfigurement, respectively, by burning Z.W. about the body. Defendant and Richardson were tried separately and simultaneously, with defendant by a jury and Richardson by the court. The State argued that defendant was guilty as both a principal and under the doctrine of accountability.

¶ 4        Around 10 a.m. on October 2, 2016, Z.W. was found, alone, on Lake Shore Drive in Chicago by Mason Arion. Arion testified that he was walking his dog that morning when he observed a young male child "sort of jogging" and "sort of limping" north along Lake Shore Drive. Arion approached the child, whom Arion

identified in court from a photograph as Z.W., and chatted with the child until a police officer arrived. Arion observed visible scars and bruises on the child.

¶ 5        Sergeant Troy Williams, an officer with the Chicago Police Department, responded on October 2, 2016, to a report of an approximately seven-year-old boy running northbound on Lake Shore Drive. Williams arrived at a park in that area and found Arion talking to a young boy. The boy identified himself as Z.W. Williams observed facial scars and bruises on Z.W. and observed that Z.W. had a limp. Z.W. was dressed in a gray shirt and blue jeans, with what appeared to be a diaper protruding from Z.W.'s waistband. Z.W. told Williams that he wanted to go to the park. When asked about his injuries, Z.W. told Williams that they were punishment wounds from his parents. Z.W. also showed Williams a wound or scar on Z.W.'s back, which Z.W. stated was from being held on a stove by his father. Due to Z.W.'s physical condition, an ambulance was sent to the scene. After paramedics initially examined Z.W., Williams and the ambulance proceeded to the apartments where Z.W. indicated he lived, 4800 South Chicago Beach Drive.

¶ 6        Lieutenant Jacob Alderden arrived at 4800 South Chicago Beach Drive after talking to Williams. Alderden observed obvious injuries on Z.W.'s face. Alderden spoke with Z.W. in the ambulance. Z.W. stated that he had been routinely beaten by his mother and his father, and he proceeded to tell Alderden about the various weapons used to inflict the injuries. At that point, Alderden halted the interview so that he could document the interview. After two officers with body-worn cameras joined them in the ambulance, Alderden continued the interview with Z.W.

¶ 7        Z.W. told Alderden that his bedroom was the closet that was to the left in the hallway of the apartment. There was a camera in the closet and also cameras outside the closet. Z.W. said the cameras were to protect him and keep him safe. Defendant, Richardson, and Z.W.'s sister, H.R., would strike Z.W. with a black baseball bat that was by the front door, on all areas of Z.W.'s body. Defendant and Richardson would strike Z.W. with Richardson's black belt and a white wire cord. Defendant would strike Z.W. with the black pole for the vacuum cleaner on his head, arms, hands, back, legs, and neck. The cuts on Z.W.'s face were caused when Richardson struck Z.W. with a metal spray bottle. Defendant and H.R. were home at the time. Z.W. said that the last time he left the apartment was last year, to go to the store. The last time Z.W. had been struck was the day before, by defendant. Alderden

then asked Z.W. what caused the scab on his back. Z.W. stated that Richardson held Z.W. against the burners on the stove. Defendant was home at the time but in the bedroom asleep with H.R. Z.W. did not tell defendant about the burn, but Z.W. heard Richardson tell defendant. Z.W. said "she didn't care"; "[s]he never does." Z.W. left the apartment that day because the front door was unlocked. He put on pants, a shirt, and shoes and ran for the elevator. Z.W. was trying to go play at the playground. Defendant would know Z.W. left the apartment because the cameras were connected to both her phone and to Richardson's phone.

¶ 8        Bodycam footage of defendant and H.R. entering the lobby on October 2, 2016, was played for the jury. Upon entering the lobby and seeing police officers, defendant calls out that she was just about to call the police. She then tells police officers that, when she left her apartment to throw something away downstairs, her son, Z.W., was not feeling well and was asleep in bed. After defendant returned about 10 minutes later, he was gone. Defendant stated that this was the first time that Z.W. had ever left the apartment alone but it was also the first time she ever left him alone. Defendant also stated that, about four years earlier, her aunt had molested Z.W. and also "beat on him and hurt him." Defendant went on to say that Z.W. was accident-prone, he tripped a lot, and he blamed the injuries on other people. When asked what happened to Z.W.'s face and body, defendant stated that Z.W. had been in a few accidents. Defendant and Z.W. had been in a motor vehicle accident five or six years earlier, and defendant and Z.W. had recently fallen down the stairs together. Defendant did not seek medical attention for either of them because she did not feel the injuries were that serious. The scar on Z.W.'s back was from the motor vehicle accident. Defendant stated that she lived alone with her two children; her former fiancé had moved to California. When asked if the former fiancé was abusive, defendant stated that the fiancé was not abusive toward her or Z.W. and the fiancé treated Z.W. very well. Defendant reported that Z.W. had a disability.

¶ 9        Marsha Byndom testified that she resided at 4800 South Chicago Beach Drive in 2015 and 2016. Byndom would see defendant out walking almost daily, pushing a little girl in a stroller. Byndom never saw any other children with defendant.

¶ 10        Ronnie Rush testified that he began working at the Newport Condominiums, 4800 South Chicago Beach Drive, in December 2015 and he was still employed

there on October 2, 2016. Rush was employed as the chief engineer and was responsible for the maintenance work on the buildings. Rush identified defendant and Richardson as residents of the condominiums. Rush would see defendant almost every morning; defendant would leave the building with a baby girl in a stroller. Rush often opened the door for defendant. Rush saw Richardson less often, possibly once or twice a week. Rush never saw defendant or Richardson together, or with any other children, other than on one occasion when Rush went to their apartment in response to a leaking bathtub in the late summer of 2016. On that day, when Rush arrived at the apartment, there was initially no response to his knock. Richardson was contacted, and Rush returned to the apartment to meet Richardson in the hallway. Richardson did an irregular knock on the door that Rush believed was a code for defendant to open the door. Defendant answered the door; she was holding the little girl that Rush had observed defendant pushing in the stroller. Rush observed a little boy on the couch in the front room that Rush had never seen before. Rush identified the little boy as Z.W. Rush noticed scratches and marks on Z.W.'s face, neck, and part of his chest. Rush testified that he did not report Z.W.'s injuries because Richardson told Rush that Z.W. was defendant's nephew and Richardson had just picked Z.W. up that morning because Z.W. was being sexually abused by an aunt.

¶ 11        Upon entering the apartment, Richardson went directly to the couch and sat shoulder-to-shoulder with Z.W. Z.W. was holding what Rush believed to be a dog shock collar. While walking around the apartment, Rush noticed a number of cameras and a closet set up like sleeping quarters. There was a pillow and a blanket on the floor of the closet, and there was a strap hanging from the closet's clothes rod. Rush shared his lunch with Z.W., with Richardson's permission.

¶ 12        Rush returned to the apartment a week or two later. Richardson answered the door, and Rush observed defendant and the little girl in the bedroom before Richardson closed the door. Rush did not observe Z.W., but he did notice that the closet door was closed that day.

¶ 13        Gabrielle Aranda testified that she was working as a social worker at Comer Children's Hospital on October 2, 2016, when Z.W. was brought into the emergency department. Z.W. was wearing a soiled diaper that was held together with duct tape. Aranda noted a number of abrasions on Z.W.'s body: above his right

eyebrow, on the bridge of his nose, on the left side of his face, behind his left ear, and on his lower back. Z.W. also had a number of older scars. Aranda identified the injuries on photographs of Z.W. in the emergency room. Z.W. told Aranda that he lived with his mother, his sister, and his father. The abrasions on his face were caused by being struck with a bottle by Richardson. The burn on his back was the result of being held on the stove by Richardson. Z.W. also identified burns on the back of his ear, on his scrotum, and on his penis as burns caused by Richardson. Z.W. told Aranda that defendant struck Z.W. with a pole and that a number of the scars and marks on his body were caused by defendant striking him with the pole. Aranda did not ask Z.W. about the source of each scar because Z.W. had too many scars.

¶ 14        Dr. Veena Ramaiah, a pediatric emergency room physician and child abuse pediatrician at Comer Children's Hospital, examined Z.W. on October 3, 2016. Dr. Ramaiah identified the wounds she noted on Z.W., which were documented in photographic exhibits. She identified many current and older scarred injuries on Z.W.'s face, neck, collarbones, shoulders, chest, abdomen, upper and lower back, arms, penis, groin area, buttocks, legs, and feet. Dr. Ramaiah defined the five parallel curved wider lines of scar on Z.W.'s abdomen as a pattern mark, consistent with the pattern of an electric stove, that was highly indicative of abusive injuries. The linear scars on Z.W.'s back were consistent with being struck with some type of implement. An ulcerated wound on Z.W.'s back was about two to three weeks old and consistent with a burn. According to Dr. Ramaiah, the number of scars on Z.W.'s genitalia, groin, and inner thigh were very specific to abusive injuries. Dr. Ramaiah ordered a skeletal survey of Z.W., which indicated a healing fracture in his right foot that was weeks to months old, a healing fracture in his left foot that was weeks old, and a healing fracture of his left femur that was weeks old. Z.W.'s scars and injuries were too numerous to count. Dr. Ramaiah's main medical diagnosis of Z.W. was physical abuse; she opined that Z.W. was a victim of torture.

¶ 15        Officer Jerry Doskocz testified that he was an evidence technician for the Chicago Police Department. While assisting with executing a search warrant of defendant's and Richardson's apartment, Doskocz took photographs of the one-bedroom apartment and identified those photographs in court. There was a black wooden baseball bat leaning against the wall at the end of the entry hallway. Along the same wall, in the living room, Doskocz identified a black belt and a pink hair

iron. There were three surveillance cameras in the apartment, one of which was in a closet. The camera wires led to a smaller television in the living room, to the right of a larger television, and showed a live feed from the cameras. There was a vacuum cleaner in the living room, along the same wall as the televisions. The stove in the kitchen was an electric stove, with electric burners. In the hallway closet near the bathroom, there was a white power strip on the floor that was not connected to a power source and a strap tied to and hanging from the closet's clothes rod. There were three okra cans and two water bottles in the same closet. In the other closet in the hallway, there was a metal starch can and a black hair iron.

¶ 16        Bryan Boeddeker, a detective with the Chicago Police Department, testified that he met with Z.W. at Comer Children's Hospital on October 2, 2016. He observed visible injuries on Z.W.'s face and arms. Z.W. described abuse by defendant and Richardson. Z.W. stated that both defendant and Richardson struck Z.W. on the feet with the black baseball bat that was kept in the hallway by the front door. Richardson burned Z.W. on the stove in the kitchen. Both defendant and Richardson struck Z.W. on the head and the back of the neck with a black belt. Z.W. said that he received the injury above his eyebrow when Richardson struck Z.W. with a metal spray bottle a few weeks earlier. Z.W. had an injury to the left side of his penis that was caused by Richardson burning him with a black hair iron. Both defendant and Richardson injured Z.W. with vacuum cleaner hoses, electrical cords, a belt, the black baseball bat, the stove, and a hair iron. Z.W. said that defendant installed the video camera inside the closet, and Z.W. had observed images of himself on both defendant's and Richardson's cell phones. Boeddeker reviewed some of the video footage that was stored on the hard drive next to the small television in the apartment; the footage was from a variety of different dates and times. The last footage that was recovered from the hard drive was from April 2016. Boeddeker did not view any footage of defendant striking Z.W.

¶ 17        Alison Alstott, a forensic interviewer for the Chicago Children's Advocacy Center, conducted the initial forensic interview of Z.W. in his hospital room at Comer Children's Hospital on October 3, 2016. During the videotaped interview, a detective, an individual from the Department of Children and Family Services, and an assistant state's attorney were present behind a curtain to observe. Z.W. told Alstott that Richardson liked to strike Z.W. When asked about the very last time that Richardson struck him, Z.W. reported that Richardson struck Z.W. on the nose

with a book in the living room. At the time, defendant was putting H.R. to sleep. Z.W. described how Richardson caused the injury to Z.W.'s back by holding Z.W.'s arms and legs and holding Z.W. against the hot burner of the stove. There were video cameras in the apartment that were linked to defendant's and Richardson's cell phones. When asked if Richardson held Z.W. on the stove more than the one time, Z.W. responded that Richardson had done it three times. The first time, Richardson used do-rags to tie up Z.W.'s arms and legs. Richardson used tape from underneath the sink to place over Z.W.'s mouth while holding him on the stove. Alstott asked if Richardson ever injured Z.W. in another way. Z.W. showed Alstott an injury over his right eye where Richardson had struck Z.W. with a metal spray bottle.

¶ 18     When asked if anyone else ever struck him, Z.W. replied that defendant would also strike him. Defendant had struck Z.W. on the head with a black vacuum pole; on his back with a black baseball bat; and on his legs, feet, back, head, arms, and hands with a belt and a white wiring cord.

¶ 19     Alstott asked if something different from the stove ever burned Z.W. Z.W. replied that Richardson had burned his "peepee" with a black hair iron. Z.W. said "they" had three hair irons, a black one, a blue one, and a pink one, and they used the black one on his "peepee."

¶ 20     Z.W. testified at trial that he was born on October 22, 2008. He was nine years old at the time of trial and was in the fourth grade. He was currently residing in a transition center. Z.W. described three homes that he had lived in with defendant and Richardson: first a yellow house until he was about four years old, then a blue house until he was about six years old, and then the apartment building. Richardson first injured Z.W. while they were living in the yellow house, tying Z.W. to a bed and striking Z.W. in the back with a baseball bat. Richardson also struck Z.W. with a wire and a belt. Richardson did the same things to Z.W. in the blue house. No one else struck Z.W. while he lived in the yellow and the blue houses.

¶ 21     After moving to the apartment, Z.W. slept in the closet, on a blanket. Defendant and Richardson would tie Z.W.'s hands to a rope hanging from the clothes rod in the closet. Z.W. was sometimes allowed out to use the bathroom. Z.W. would often eat in the closet, mostly okra and water. While living in the apartment, Richardson did a number of things to injure Z.W., including striking Z.W. in the face with a

baseball bat. Defendant struck Z.W.'s feet with the bat. Richardson burned Z.W.'s face on the stove, and Richardson also burned Z.W.'s privates with the stove and a hair iron. Defendant also burned Z.W.'s privates with a hair iron. On cross-examination, Z.W. confirmed that defendant burned Z.W.'s privates with a hair iron, at a different time than when Richardson did so. Although Z.W. did not initially tell the police officers that defendant had also burned his privates with a hair iron, Z.W. did tell Alstott during the videotaped interview at the hospital.

¶ 22　　　On the day Z.W. escaped from the apartment, defendant had tied Z.W. to the rope in the closet. Richardson was in California. Z.W. managed to untie the knot, and he took the elevator down to leave the building. Z.W. testified that sometimes defendant would be away from the apartment when Richardson hurt Z.W., but sometimes defendant was home. If defendant was home, she would try to calm H.R.

¶ 23　　　Defendant testified in her own defense. She met Richardson in 2012, when Z.W. was almost four years old, and they began living together later in 2012. In late 2012, an allegation was made by Richardson and a family friend that defendant's aunt was sexually abusing Z.W. Defendant called the police and took Z.W. to the emergency room. Defendant's aunt moved out, and defendant, Richardson, and Z.W. continued to live with defendant's grandmother until the grandmother passed away in July 2013. Then, they moved in with Richardson's father. During that time, Z.W. was attending preschool. Defendant thought that Richardson was initially very good with Z.W., but she first witnessed Richardson strike Z.W. in December 2013. Richardson struck Z.W. in the back of his head so hard that Z.W. stumbled. Defendant told Richardson not to do that again. Defendant's and Richardson's daughter, H.R., was born in January 2014.

¶ 24　　　Defendant, Richardson, and both children moved again around August 2015, after Richardson's father passed away, into the apartment. Richardson installed cameras inside the apartment that he could monitor. Richardson was a personal trainer with an inconsistent schedule. When they first moved into the apartment, defendant, Z.W., and H.R. would go to the park, play video games, and play with toys. Z.W. no longer attended school; defendant homeschooled him. Z.W. initially slept on the couch, but he was having accidents, so defendant and Richardson obtained an air mattress for Z.W. to sleep on in the living room. Eventually, Richardson decided that Z.W. should sleep in the closet.

¶ 25    After moving to the apartment, Richardson became more agitated with Z.W. Richardson also started striking defendant. Defendant was frightened of Richardson because he was physically stronger than her. Defendant and Richardson never left the apartment together, but defendant would take Z.W. and H.R. out when Richardson was not around. When she left the apartment, Richardson would become angry and call her, telling her to return to the apartment. Richardson knew that defendant had left the apartment because he monitored the cameras.

¶ 26    According to defendant, Richardson had threatened to strike Z.W. with a belt, but she never witnessed Richardson do so. She only witnessed Richardson strike Z.W. with his hand. Defendant admitted that she struck Z.W. with a belt and a "stretchy plastic" hose from the vacuum cleaner, but only on his bottom. Defendant denied ever striking Z.W. with a baseball bat or ever burning him on the stove. She did admit to accidently burning Z.W. once with a hair iron on his back. Defendant denied tying Z.W. up in the closet. Defendant was aware of a scar on Z.W.'s penis, but she denied knowing that it was caused by an injury. Defendant was aware that Z.W. had a number of scars, but she did not know how he received most of them.

¶ 27    In mid-2016, Richardson began acting more violently toward Z.W. and striking Z.W. more often. Defendant saw marks on Z.W., and when she questioned Richardson, he admitted to striking Z.W. Richardson struck defendant if she suggested taking Z.W. to the hospital for injuries. Richardson was in charge of bathing Z.W., but defendant walked in once and observed scars on Z.W.'s stomach. When defendant confronted Richardson regarding the scars, Richardson said that he had punished Z.W. for misbehaving. Defendant admitted that Z.W. was terrified of Richardson.

¶ 28    About a month before October 2, 2016, Richardson told defendant, if asked about Z.W.'s injuries, to say that she and Z.W. had gotten into a motor vehicle accident or that she and Z.W. had fallen down the stairs. This was in response to Richardson getting more violent with Z.W. and Z.W. having more marks on his body. With respect to the wound on Z.W.'s nose, Richardson told defendant that he threw a book at Z.W. and accidently struck Z.W. in the face. Defendant noticed the injury on Z.W.'s left eyebrow about a week before October 2. Richardson told defendant that he struck Z.W. Defendant cleaned both wounds but did not call the police or take Z.W. to the hospital.

¶ 29      Defendant denied leaving the apartment every day with H.R., but she did admit that she did not take Z.W. out of the apartment at all in the two weeks preceding October 2 due to the wounds on Z.W.'s face. Defendant only left the apartment on the morning of October 2 with H.R. to throw away some garbage. It was the first time she had ever left Z.W. home alone. At the time, Richardson was out of town and had been for several days. When defendant returned to the apartment and discovered Z.W. gone, defendant tried to call 911, but the call would not connect.

¶ 30      Defendant was not aware of how Z.W. received all the scars on his face, but she believed that one was from an accident a few years earlier. Defendant also denied knowing that Z.W. had ever broken his femur; she thought Z.W. walked differently because he was pigeon-toed. She was aware that Z.W. had a number of scars on his back.

¶ 31      At the jury instruction conference, the State offered the pattern jury instruction on accountability, which was given over defendant's objection as People's instruction No. 14:

"A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of an offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of an offense.

The word 'conduct' includes any criminal act done in furtherance of the planned and intended act." Illinois Pattern Jury Instructions, Criminal, No. 5.03 (approved Oct. 28, 2016) (hereinafter IPI Criminal No. 5.03).

¶ 32      The State also offered two nonpattern jury instructions from the committee note to IPI Criminal No. 5.03, which were given over defendant's objection. One of those instructions, the instruction at issue here, People's instruction No. 15, stated:

"A parent has a legal duty to aid a small child if the parent knows or should know about a danger to the child and the parent has the physical ability to protect the child. Criminal conduct may arise by overt acts or by an omission to act where there is a legal duty to do so." IPI Criminal No. 5.03, Committee Note (approved Oct. 28, 2016).

- 11 -

¶ 33    Defendant argued that People's instruction No. 15 should not be given pursuant to *People v. Pollock*, 202 Ill. 2d 189 (2002), because the instruction improperly defined the necessary mental state for aggravated battery. The trial court overruled the objection, distinguishing *Pollock* on the basis that defendant's knowledge of the purported abuse in *Pollock* was at issue, while defendant's knowledge of the abuse in the instant case was not at issue, since defendant testified that she knew of the abuse. Specifically, the court stated:

> "[I]n *Pollock*, that was a scenario where there was evidence by which it was possible that the defendant did not know of the purported abuse by the other person. By virtue of [defendant's] testimony, it is clear that [defendant] did know. So I don't think taking the, should know, out is appropriate in this because [defendant] acknowledged by virtue of her testimony that she did know. So unlike *Pollock* where there was purportedly an instance where the instructions had the potential effect to put criminal liability upon a person who, A, might not have known and perhaps could not have known, that's not the scenario that we have here on the evidence."

¶ 34    In her closing argument, the prosecutor discussed the elements that the State needed to prove, as stated in the jury instructions, including the proposition of legal responsibility and accountability. The prosecutor read the accountability instructions to the jury and stated: "most importantly in this case, His Honor will tell you that a parent has a legal duty to aid a small child if the parent knows or should know about a danger to the child, and the parent has the physical ability to protect the child." The prosecutor argued that defendant personally inflicted great bodily harm on Z.W. Additionally, the prosecutor argued that defendant was legally responsible for Richardson's abuse of Z.W. because defendant knew what Richardson was doing to Z.W. and she not only did nothing but she facilitated the abuse. Defense counsel argued that defendant could not physically fulfill her duty as a parent to protect Z.W. because Richardson was controlling and striking her, too. If defendant attempted to stop Richardson, Richardson struck defendant.

¶ 35    The jury found defendant guilty on all four counts of aggravated battery of a child. In her amended motion for a new trial, which was denied, defendant argued, *inter alia*, that the trial court erred in allowing the "should know" language in People's instruction No. 15 over defendant's objection.

¶ 36    At sentencing, the trial court found that the permanent disfigurement counts (counts IV and VI) merged with the great bodily harm counts (counts II and V), and it sentenced defendant to consecutive 25-year sentences on counts II and V. The court found that the criminal conduct forming the basis for the verdicts was accompanied by brutal and heinous behavior indicative of wanton cruelty. The court specified on the record that defendant's liability was not premised on her passive presence; rather, both defendant and Richardson "were active participants in the brutalization of [Z.W.]"

¶ 37    On appeal, defendant argued that the trial court incorrectly instructed the jury on accountability. 2021 IL App (1st) 190493, ¶ 2. The appellate court affirmed defendant's convictions, rejecting defendant's argument that the jury received contrary and conflicting instructions on accountability such that defendant was deprived of a fair trial. *Id.* ¶ 65. The jury was instructed on the theory of accountability with IPI Criminal No. 5.03, and it was also given additional accountability instructions derived from the committee note for IPI Criminal No. 5.03. *Id.* ¶¶ 53-54. The additional accountability instructions, which concerned parental accountability, were derived from *People v. Stanciel*, 153 Ill. 2d 218 (1992). 2021 IL App (1st) 190493, ¶ 56. After summarizing *Stanciel* (*id.*), the court analyzed the resulting parental accountability instruction that was given in *Pollock* (*id.* ¶ 57). In *Pollock*, the defendant had been convicted solely on the basis that she was accountable for her boyfriend's actions that resulted in the murder of her child. *Id.* Under the facts of *Pollock*, where there was no evidence that the defendant abused her child, no evidence that she was present when her child was abused, and no evidence that she was aware of any abusive acts committed by her boyfriend, the law of accountability was misstated in the additional instruction and in the State's repeated argument that the defendant could be found guilty if she did not know, but should have known, that her boyfriend was abusing her child. *Id.* ¶ 60. Since the State's case was based exclusively on the defendant's accountability, the error was not harmless. *Id.*

¶ 38    In affirming defendant's convictions, the appellate court found that there was no confusion or inconsistency between the primary accountability instruction and the issues instructions, so the jury was properly informed of the required mental state. *Id.* ¶ 65. Specifically, the appellate court found that (1) the evidence overwhelmingly established that defendant was aware of the injuries sustained by

Z.W. and inflicted by Richardson, (2) the State only referred to the additional accountability instruction once during closing arguments when it was read to the jury, (3) the State was not relieved of its burden of proof because the primary accountability instruction and the issues instruction did not state that defendant "knew or should have known" and neither minimized the requirement of knowing mental state, and (4) the State pursued and overwhelmingly established that defendant was a principal just as much as she was accountable for Richardson's acts. *Id.* ¶¶ 62-68.

¶ 39       In her petition for leave to appeal, defendant argued that (1) the jury instruction error could not be, and was not, harmless error, (2) the appellate court read *Pollock* too narrowly and misapprehended the facts of *Pollock*, and (3) the appellate court overlooked the fact that the State encouraged the jury to give special emphasis to People's instruction No. 15. We allowed defendant's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Oct. 1, 2021).

¶ 40                                            ANALYSIS

¶ 41       Defendant argues that she was denied a fair trial because the trial court gave the jury directly conflicting instructions regarding accountability, one of which incorrectly stated that a negligent mental state was sufficient to trigger a parent's liability. Defendant contends that when a jury receives conflicting instructions on the law, one of which is incorrect, such instructional error can never be deemed harmless.

¶ 42       The State acknowledges that this court, in *Pollock*, held that it is error to instruct the jury that a parent's duty to act is triggered if a parent "should know" a child is being abused because a knowing mental state is required for aggravated battery of a child. But the State argues that defendant's convictions should be affirmed because any error in the accountability instructions was harmless where the evidence showed beyond a reasonable doubt that defendant was guilty as a principal, so defendant's knowledge of Richardson's abuse of Z.W. was not an essential element. Alternatively, the State argues that, even if defendant was convicted under the accountability theory, any error in the parental duty portion of the instructions was also harmless because defendant admitted at trial that she knew

- 14 -

Richardson was abusing Z.W. and knew she had a duty to protect Z.W. but that it was impossible for her to do so.

¶ 43    To prove a defendant guilty of aggravated battery of a child, the State must prove that the defendant was at least 18 years old, committed a battery, and knowingly or without legal justification caused great bodily harm or permanent disfigurement to a child under the age of 13. 720 ILCS 5/12-3.05(b)(1) (West 2016). A defendant may be found guilty based upon her actions as a principal, or she may be found guilty based upon behavior that makes her accountable for the crimes of another. See *Stanciel*, 153 Ill. 2d at 233; 720 ILCS 5/5-2(c) (West 2016). Accountability is specifically linked to the crime charged, so the intent is dictated by the underlying crime. *Stanciel*, 153 Ill. 2d at 233. Aggravated battery of a child is an offense that requires a knowing or intentional state of mind. *Pollock*, 202 Ill. 2d at 209.

¶ 44    As noted above, the jury was given People's instruction No. 14, IPI Criminal No. 5.03, which accurately instructed the jury on the law of accountability. See 720 ILCS 5/5-2(c) (West 2016). Over defendant's objection, the court gave additional accountability instructions. People's instruction No. 15, a nonpattern jury instruction, provided that a parent had a legal duty to aid a small child if the parent "knows or should know" about a danger to the child. This instruction was derived from *Stanciel*, which addressed the consolidated appeals of two mothers who were both held accountable for their respective child's murder by a paramour. *Stanciel*, 153 Ill. 2d at 232. We held in *Stanciel* that, to sustain a conviction for murder on accountability grounds, it was sufficient to show that, since murder was a general intent crime, a defendant had a general intent to promote or facilitate the commission of the offense. *Id.* at 234. Intent to promote or facilitate could be shown by evidence that a defendant shared the criminal intent of the principal or there was a common criminal design. *Id.* at 234-35. We concluded that a mother's knowledge that her child was the victim of a pattern of abuse, along with the mother's continued sanctioned exposure of the child to the abuse, was sufficient to support the inference that the mother shared the principal's criminal intent or there was a common criminal design. *Id.* at 235. The mothers could be found legally responsible for the murders of their children based on their failure to protect them from what they knew was serious ongoing abuse. *Id.* at 237. As we later clarified in *Pollock*, the statement in *Stanciel* that defendants " 'either knew or should have

- 15 -

known of the serious nature of the injuries which the victims were sustaining' " was not intended to reduce the knowing or intentional *mens rea* requirement. (Emphasis omitted.) *Pollock*, 202 Ill. 2d at 215 (quoting *Stanciel*, 153 Ill. 2d at 237). Rather, that statement stands for the proposition that, when accountability is based on failure to act, a parent's knowledge that there was a substantial risk that death or great bodily harm would result can be inferred from evidence that the parent was aware of the severity of the injuries being sustained by the child. *Id.*

¶ 45     Thus, as we found in *Pollock*, IPI Criminal No. 5.03 correctly instructed jurors that accountability liability required a knowing mental state. The instruction based on the committee note to IPI Criminal No. 5.03 incorrectly allowed that a negligent mental state sufficed to trigger a parent's culpability. See *id.* at 216.

¶ 46     Although acknowledging that People's instruction No. 15 was incorrect, the State contends that the error is subject to harmless-error review. Generally, jury instructions, when considered as a whole, should fully and fairly announce the law that is applicable to the case. *Id.* at 210. While IPI instructions that are appropriate to the issues in the case should be given, a trial court may exercise its discretion and give nonpattern instructions. *Id.* at 211-12. However, as a whole, the instructions must not be misleading or confusing. *Id.* at 212.

¶ 47     Defendant acknowledges that some errors in jury instructions can be considered harmless, such as when an inaccurate instruction, standing alone, may be misleading but other instructions clear up the confusion. See *People v. Nere*, 2018 IL 122566, ¶ 67. Defendant contends, though, that the giving of two directly conflicting instructions on an essential issue in the case can never be harmless. In support of her argument, defendant relies primarily on *People v. Jenkins*, 69 Ill. 2d 61 (1977), *Pollock*, 202 Ill. 2d 189, and *People v. Hartfield*, 2022 IL 126729.

¶ 48     In *Jenkins*, a jury found the defendant guilty of attempted murder. *Jenkins*, 69 Ill. 2d at 63. The jury was given two issue instructions, one submitted by the State and one submitted by the defendant. *Id.* at 64. The State's attempted murder instruction required the jury to find the defendant guilty if he performed an act that constituted a substantial step toward the commission of the crime of murder and did so with the intent to commit that particular crime. *Id.* The State's instruction made no mention of the third essential element: the defendant must not have been justified in using the force employed. *Id.* at 65. The defendant's attempted murder

instruction was correct; it directed the jury to find the defendant guilty if all three elements were present. *Id.* Applying plain error analysis because the defendant failed to object to the State's instruction, this court held that the giving of two conflicting mandatory instructions on an essential element that was at issue in the case was a prejudicial error and required reversal. *Id.* at 65-66. In reaching that conclusion, we relied on the fact that the instructions were mandatory and directly contradictory on the element of justified use of force, which was at issue in the case, so it could not be known if the defendant was convicted on the basis of the erroneous instruction. *Id.* at 67 ("Where the instructions are contradictory[,] the jury is put in the position of having to select the proper instruction—a function exclusively that of the court.").

¶ 49    In *Pollock*, the jury was given the same additional nonpattern jury instruction regarding parental accountability that was given in this case, based upon the committee note to IPI Criminal No. 5.03 and *Stanciel*:

"A parent has a legal duty to aid a small child if the parent knows or should have known about a danger to the child and the parent has the physical ability to protect the child.

Criminal conduct may arise not only by overt acts, but by an omission to act where there is a legal duty to do so." (Internal quotation marks omitted.) *Pollock*, 202 Ill. 2d. at 208.

We concluded that the law of accountability was misstated in that the jury was instructed that the defendant could be held accountable if she did not know, but should have known, of her paramour's abusive conduct. *Id.* at 216. It was undisputed that the defendant was convicted of aggravated battery of a child and felony murder based solely on the theory of accountability. *Id.* at 210. Under the specific facts of that case, where there was no evidence the defendant knew of any abuse by her paramour, but the jury received the "should have known" instruction and the prosecutor repeatedly argued that the defendant could be held accountable if she did not know, but should have known, that her paramour was abusing her child, the additional accountability instruction could not be deemed harmless. *Id.* at 216.

¶ 50    Our statement in *Pollock* that "[i]f conflicting instructions are given, one being a correct statement of law and the other an incorrect statement of law, the error cannot be deemed harmless" (*id.* at 212) has to be interpreted in light of the facts of the case. Reading *Pollock* as applicable to its facts, rather than for a broad statement of law that conflicting jury instructions can never be harmless error, is in line with our decision in *People v. Jones*, 81 Ill. 2d 1, 10 (1979).

¶ 51    In *Jones*, the defendant was convicted of attempted murder. *Id.* at 4. While the offense of attempted murder required the mental state of specific intent to kill, the jury also received definitional murder instructions that referred to both intent to do bodily harm and knowledge that one's acts may cause, or create the possibility of, bodily harm. *Id.* at 7-8. We held that the error in the conflicting jury instructions on intent to kill was harmless, since intent to kill was "blatantly evident from the circumstances" and the only question for the jury was whether the defendant was the perpetrator. *Id.* at 10.

¶ 52    While this case was pending on appeal, we filed the opinion in *Hartfield*, 2022 IL 126729. Defendant argues that *Hartfield* reaffirms the proposition that two directly conflicting jury instructions on the burden of proof in relation to an essential element of the offense cannot be deemed harmless.

¶ 53    In *Hartfield*, the jury was instructed that a person commits the offense of aggravated discharge of a firearm when he knowingly discharges the firearm in the direction of a peace officer. *Id.* ¶ 18. However, in response to questions from the jury during deliberations, the jury was instructed to determine if officers may have been in the line of fire. *Id.* ¶ 22. Since the defendant did not preserve the issue for review, we reviewed the jury instruction error for plain error. *Id.* ¶¶ 48-49. After concluding that the mid-deliberation instruction was not an accurate statement of the law, we held that the error was presumed prejudicial. *Id.* ¶ 59. "[T]wo directly conflicting instructions on an essential element, one stating the law correctly and the other erroneously, cannot be cured this way due to the simple fact that we can never know which instruction the jury was following." *Id.*

¶ 54    In line with *Hartfield*, we conclude that directly conflicting instructions may be harmless when they do not concern a disputed essential issue in the case so that there is not a fear that the jury relied on the incorrect instruction.

¶ 55 Since we have concluded that erroneous conflicting jury instructions may be harmless, we must consider if they are harmless in this case. " 'An error in a jury instruction is harmless if it is demonstrated that the result of the trial would not have been different had the jury been properly instructed.' " *People v. Mohr*, 228 Ill. 2d 53, 69 (2008) (quoting *People v. Pomykala*, 203 Ill. 2d 198, 210 (2003)). While we generally review for an abuse of discretion a trial court's decision to give a particular instruction (*id.* at 66), we review *de novo* the question of whether the jury instructions accurately conveyed the applicable law to the jury (*People v. Pierce*, 226 Ill. 2d 470, 475 (2007)).

¶ 56 Defendant does not challenge the sufficiency of the evidence to support her convictions. If she had, our review would be whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Dennis*, 181 Ill. 2d 87, 95 (1998). Rather, to establish that an error was harmless, the State must prove beyond a reasonable doubt that the jury verdict would have been the same absent the error. *People v. Salamon*, 2022 IL 125722, ¶ 121. "Where the evidence of guilt is clear and convincing, an instructional error may be deemed harmless." *Dennis*, 181 Ill. 2d at 95.

¶ 57 We begin by addressing the State's primary argument—that the error in the parental duty portion of the accountability instructions was harmless because the evidence proved that defendant was guilty as a principal. The State relies on the theory that when a jury is instructed on multiple theories of guilt, one of which is improper, harmless-error analysis is proper, citing *People v. Davis*, 233 Ill. 2d 244, 270-71 (2009). In *Davis*, the defendant argued that the jury was incorrectly instructed that it could convict him of felony murder based on aggravated battery, since the acts in the aggravated battery were the predicate for the first degree murder counts. *Id.* at 262. We agreed with the State that it was error, but any error was harmless under the one-good-count presumption. *Id.* at 263. In *Davis*, the defendant was charged with three different theories of first degree murder—intentional, knowing, and felony murder—for killing a single victim, and the jury returned the single general verdict form finding the defendant guilty. *Id.* When such a general verdict is returned, the defendant is guilty as charged in each count, and it is presumed that defendant committed the most serious offense. *Id.*

¶ 58    In *People v. Williams*, 161 Ill. 2d 1, 51 (1994), the trial court gave an accountability instruction when there was no evidence to support that theory of guilt. We concluded that, since the entirety of the State's case was that the defendant alone shot the victim, the jury could not have convicted the defendant on the theory that he was accountable for the acts of others, so the extra accountability instruction was harmless error. *Id.* at 51-52.

¶ 59    Defendant argues that these cases do not involve directly conflicting instructions. Although the situations in *Davis* and *Williams* involved giving additional instructions that were not warranted by the law or by the evidence, the State argues that the logic also applies when an erroneous instruction on accountability is given, and warranted by the evidence, but the evidence is sufficient to convict defendant as a principal. We agree with the State. See *People v. Leger*, 149 Ill. 2d 355, 404 (1992) (erroneous jury instructions that allowed jury to convict for attempted murder based upon felony murder and knowledge that the act performed would cause death or created a strong probability of death, rather than intent to kill, did not amount to reversible error when intent to kill was clear from the evidence).

¶ 60    Defendant and Richardson were charged jointly in the four counts of aggravated battery that proceeded to trial. Counts V and VI alleged that defendant and Richardson burned Z.W., and counts II and IV alleged that defendant and Richardson struck Z.W. The State's theory was that defendant and Richardson acted together to brutalize and torture Z.W. Defendant does not challenge the jury instructions regarding principal liability.

¶ 61    The State proved that defendant was guilty as a principal of aggravated battery of a child by striking, causing Z.W. great bodily harm, beyond a reasonable doubt. In the ambulance before going to the hospital, Z.W. told Alderden that defendant struck Z.W. with a black bat, a black belt, a white wire cord, and a pole for the vacuum cleaner. Z.W. made essentially the same statements to Alstott in the forensic interview: defendant struck Z.W. in the head with a black vacuum pole; on his back with a black baseball bat; and on his legs, feet, back, head, arms, and hands with a belt and a white wiring cord. In the hospital, in separate interviews, Z.W. told Aranda that defendant struck Z.W. with a pole, which caused a number of Z.W.'s scars and marks, and told Boeddeker that defendant struck Z.W. on his feet

with a baseball bat and on his head and neck with a black belt. Dr. Ramaiah testified that the linear scars on Z.W.'s back were consistent with being struck with some type of implement. Further, Z.W. testified at trial that defendant struck Z.W.'s feet with a baseball bat, and medical imaging revealed prior fractures in both of Z.W.'s feet. Defendant admitted at trial that she struck Z.W. with a belt and the hose from the vacuum cleaner. A black baseball bat was recovered in the entry hallway of the apartment, a black belt and a vacuum cleaner were recovered in the living room, and a white power strip, not connected to any power source, was recovered in the closet that functioned as Z.W.'s bedroom. On the day that Z.W. escaped from the apartment, defendant made a number of statements to police that can be considered evidence of consciousness of guilt: Z.W. was accident prone, Z.W. tripped a lot and blamed other people, defendant's aunt had hurt Z.W., defendant and Z.W. had been in a motor vehicle accident, and defendant and Z.W. had fallen down the stairs. See *People v. Milka*, 211 Ill. 2d 150, 181 (2004) (a false exculpatory statement is probative of defendant's consciousness of guilt).

¶ 62        The State also proved that defendant was guilty as a principal of aggravated battery of a child by burning, causing Z.W. great bodily harm, beyond a reasonable doubt. Z.W. testified unequivocally at trial that defendant burned his privates with a hair iron and reiterated that testimony when challenged on cross-examination. See *People v. Gray*, 2017 IL 120958, ¶ 36 ("The testimony of a single witness is sufficient to convict if the testimony is positive and credible, even where it is contradicted by the defendant."). Defendant challenges this testimony on the basis that Z.W. did not make the same allegation to the police at the scene or to the forensic interviewer. Defendant argues that Z.W.'s testimony was uncorroborated and impeached because Z.W.'s prior statements had been consistent that Richardson burned him. Z.W. acknowledged at trial that he did not tell the first responders or the police officers that defendant burned him, but he did tell Alstott during the videotaped forensic interview. In that interview, Z.W. told Alstott that "they" (defendant and Richardson) both burned Z.W. with the hair iron. Z.W. was never asked to catalog and describe every injury and scar on his body; according to Dr. Ramaiah, Z.W.'s scars were too numerous to count, including numerous scars on his genitalia, groin, and inner thigh. Defendant admitted to burning Z.W. with a hair iron, although she claimed it was an accident. A pink hair iron was recovered from the living room of the apartment, near the black belt, and a black hair iron was found in a closet.

¶ 63    We find that the evidence of defendant's guilt as a principal in the abuse of Z.W. was clear and convincing; the State proved beyond a reasonable doubt that the jury verdict would have been the same absent the error. Since, under the principal liability theory, defendant's knowledge of Richardson's actions toward Z.W. was not an essential element, any error in the parental accountability instruction was harmless in this case. See *Jones*, 81 Ill. 2d at 10 (where intent to kill was "blatantly evident from the circumstances," contradictory instruction on the necessary intent was harmless). But *cf. Jenkins*, 69 Ill. 2d at 66 (directly contradictory instructions on essential element at issue in the case is prejudicial error); *Hartfield*, 2022 IL 126729, ¶ 59 (same). Of note, at sentencing, the trial court emphasized that defendant was guilty as a principal who personally abused Z.W. The trial court stated that the record was "replete" with evidence that both defendant and Richardson "were active participants in the torture of this child" and defendant's liability was not based on her passive presence.

¶ 64    Alternatively, the State argues that defendant's knowledge of Richardson's abuse of Z.W. was uncontested and not at issue in the case, so the "should have known" language in the parental accountability instruction was harmless in this case. While we are affirming defendant's conviction on the basis of principal liability, we note that the evidence of defendant's knowledge and participation in the abuse of Z.W. was clear and convincing. Not only did Z.W. have visible injuries that were noted by every witness, defendant admitted that she knew Richardson was becoming more violent and striking Z.W. more often. Defendant admitted that the stories that defendant told police about Z.W. being injured in a motor vehicle accident and a fall on the stairs were fabricated in response to more marks on Z.W.'s body that might need to be explained. Defendant also admitted that she was aware that Z.W. had a number of marks and scars on his body, and she had even suggested to Richardson that Z.W. should be taken to the hospital for some of his injuries. Defendant knew that Z.W. was terrified of Richardson. In light of defendant's proven, and admitted, knowledge of the ongoing abuse of Z.W., there is no chance that the jury relied on the "should have known" language in the parental accountability instruction. See *Jones*, 81 Ill. 2d at 9 ("[w]e would be remiss, on these facts, to hold the conviction should be reversed").

¶ 65    It should be noted that both parties have requested the amendment of the committee notes to IPI Criminal No. 5.03. We suggest that, until such time as the

drafting committee proposes an amendment, any instruction on parental accountability not include the "should have known" language.

¶ 66                                CONCLUSION

¶ 67        For the foregoing reasons, the judgments of the circuit and appellate courts are affirmed.

¶ 68        Affirmed.

¶ 69        JUSTICE ROCHFORD took no part in the consideration or decision of this case.