2025 IL App (3d) 220510

Opinion filed May 9, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Kankakee County, Illinois, |
|---|---|---|
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-22-0510 Circuit No. 20-CF-429 |
| RASHAGUN M. HALE, | ) ) ) | Honorable William S. Dickenson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE DAVENPORT delivered the judgment of the court, with opinion.
Justices Hettel and Bertani concurred in the judgment and opinion.

_____

**OPINION**

¶ 1        A jury found defendant, Rashagun M. Hale, guilty of two counts of first degree murder (720 ILCS 5/9-1(a) (West 2018)). The trial court merged the counts and sentenced defendant to 45 years' imprisonment. Defendant appeals, raising numerous claims of error. We conclude the court erroneously instructed the jury it could find the State proved defendant guilty of both first degree murder and reckless homicide—two offenses predicated on inconsistent mental states. And, although the court also gave a correct instruction that contradicted its erroneous instruction, we cannot discern from the record which instruction the jury followed. Accordingly, we reverse and remand for further proceedings.

I. BACKGROUND

¶ 3        At around 1:38 a.m. on January 1, 2019, a Kankakee police officer found Anthony Stewart lying by a dumpster on Oak Street, which runs east and west, near its intersection with Chicago Avenue, which runs north and south. Stewart had suffered catastrophic injuries and was nonresponsive, and he died before paramedics arrived. Video surveillance footage from the area showed Rashaad Higgins, Warren Thomas, and defendant chasing down and beating Stewart and then leaving him lying motionless near the curb on the northern edge of Oak Street, just east of Chicago Avenue. The same surveillance footage also showed, about a minute after the beating had stopped, a GMC Suburban SUV moving east on Oak Street toward Stewart's body. Seconds later, a low-riding Ford F-150 pickup truck followed. Defendant was driving the Suburban, and Thomas was driving the F-150 with Higgins in the passenger seat. The F-150 struck Stewart's body and dragged it about 30 feet east along Oak Street, leaving it by the dumpster. At trial, the parties disputed whether the Suburban struck Stewart's body as well.

¶ 4                                A. The Charges

¶ 5        A grand jury indicted defendant on four counts of first degree murder. Two of the counts alleged defendant caused Stewart's death by striking Stewart with a vehicle, with intent to cause great bodily harm (*id.* § 9-1(a)(1)) (count I) or knowing such act created a strong probability of death or great bodily harm (*id.* § 9-1(a)(2)) (count III). The other two counts alleged defendant caused Stewart's death by striking Stewart about the body with his hands and feet, with the intent to cause great bodily harm (count II) or knowing such act created a strong probability of death or great bodily harm (count IV). Before trial, the State dismissed two other counts of the indictment, which charged defendant with reckless homicide and leaving the scene of an accident involving death.

¶ 6      At trial, counts I and III were presented to the jury as one charge. We will refer to them collectively as the vehicle strike count. As to this count, the court gave, at defendant's request, a lesser-included offense instruction on reckless homicide but refused defendant's request for a lesser-included instruction on aggravated battery. Counts II and IV were presented as a second charge. We will refer to them collectively as the physical beating count. As to this count, the court gave, at defendant's request, a lesser-included offense instruction on aggravated battery.

¶ 7      The State's theory was that Stewart's death was caused by either the physical beating, the vehicle strikes, or some combination thereof. In addition, the State posited the physical beating and vehicle strikes were part of a continuous offense and defendant was accountable for all of Thomas's acts during the offense, including Thomas striking Stewart with the F-150.

¶ 8      Defendant's theory was that the physical beating and vehicle strikes were two separate offenses, not part of a continuous act. He conceded he participated in the physical beating but contended the beating did not cause Stewart's death. Rather, Stewart's death was caused by Thomas's act of running over and dragging him with the F-150. Thus, defendant asserted, he committed an aggravated battery, and he did not intend to or agree to continue the attack on Stewart with the vehicles after the aggravated battery was complete. If he struck Stewart with the Suburban, defendant posited, he acted recklessly.

¶ 9                                      B. Pretrial Motions

¶ 10                  1. *The State's Motion to Admit Other Crimes Evidence*

¶ 11      Before trial, the State moved to admit proof of other crimes. See Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Specifically, the State asked to introduce evidence that at approximately 1 a.m. on December 23, 2018, defendant was pulled over while driving the Suburban, which was owned by his girlfriend Jennifer Liddell, arrested for driving with a revoked driver's license, and ticketed for

3

having no insurance. After a hearing, the trial court granted the State's motion in part, allowing the State to present evidence that defendant was pulled over while driving the Suburban. Ultimately, the parties stipulated that if Sergeant Steven Hunter was called to testify, he would state that at approximately 1 a.m. on December 23, 2018, he "pulled over a 1995 GMC Suburban, blue in color, license plate number [redacted]. The driver of that GMC Suburban *** was the defendant Rashagun Hale."

¶ 12                    2. *Defendant's Motion to Bar Expert Testimony*

¶ 13        Before trial, the State notified defendant it intended to present the testimony of an accident-reconstruction expert, Trooper David Verkler, who had reviewed the surveillance video footage during the investigation. The State disclosed Verkler's report, in which Verkler described what he saw in the surveillance footage. Relevant here, Verkler wrote the Suburban "proceed[ed] up to the area where Stewart [was] and [drove] over him."

¶ 14        Defendant filed a motion *in limine*, asking the court to bar Verkler from describing to the jury what he saw in the surveillance footage.[1] Defendant argued Verkler's description of the video's contents went beyond his expertise as an accident-reconstruction expert and the jury should be permitted to determine on its own what the video showed. The trial court denied defendant's motion. It also denied his midtrial motion to reconsider that ruling.

¶ 15                         C. Jury Trial

¶ 16                    1. *The Events of December 31 and January 1*

¶ 17        The evidence at trial established that on December 31, 2018, David Parnell and Stewart celebrated the new year by playing cards and drinking tequila at Stewart's apartment on South Dearborn Avenue with a small group of friends. Their cousin, Higgins, was partying across the

---

[1]The record indicates defendant amended the motion, but no copy appears in the record.

street at Robert Williams's residence. Defendant and Thomas were present with Higgins at Williams's residence. Higgins and Parnell both testified there was no interaction between the two separate gatherings.

¶ 18     Around 1 a.m., Parnell and Stewart left the apartment to visit Stewart's godson. They walked north on Dearborn Avenue. They were intoxicated and drank a bottle of New Amsterdam vodka as they walked. Parnell believed they detoured from Dearborn Avenue before reaching Court Street, but he was unable to recall any specifics. The next thing he remembered was waking up in the hospital while receiving stitches to a wound on the right side of his forehead. He also had a black eye and other cuts on the side of his face and his ear.

¶ 19     Higgins attended Williams's party with defendant and Thomas. They arrived together in Thomas's vehicle before midnight. Higgins was not directly asked at trial what vehicle they arrived in, but he testified that he and Thomas left the party in Thomas's F-150, a fact not in dispute. During the party, Higgins drove defendant to Liddell's house so defendant could pick up Liddell's Suburban. Defendant and Higgins returned to the party with both vehicles before midnight.

¶ 20     Defendant, Thomas, and Higgins drank heavily during the party, and they left, intoxicated, around 1:20 a.m. Higgins believed the plan was to drive to a bar to continue drinking. He rode with Thomas in the F-150, and defendant drove alone in the Suburban. The three men never went to the bar.

¶ 21     Instead, Higgins testified, they detoured to the area of Chicago Avenue and Oak Street, where Parnell and Stewart were present. Surveillance cameras located on the nearby Salvation Army building and Social Security Administration (SSA) office captured footage of Higgins, Thomas, defendant, and Stewart in the area. Higgins's testimony, along with the footage, established that at about 1:21 a.m., Thomas and Higgins parked facing south on Chicago Avenue,

5

south of its intersection with Oak Street. About 15 seconds later, defendant arrived and parked behind Thomas. Higgins did not know why they had stopped and had not heard defendant or Thomas discussing an attack on someone. At first, Higgins did not know the two men who they would encounter were Parnell and Stewart.

¶ 22 The three men exited the vehicles. According to Higgins, Thomas said nothing to him before exiting. Thomas then ran up to and "swung on" Parnell, knocking him unconscious. Higgins did not see if Thomas struck Parnell with an object. Thomas's attack on Parnell was not captured on video.

¶ 23 Thomas, Higgins, and defendant then chased down Stewart. The surveillance camera on the SSA office captured the attack. The dumpster can be seen on the far right side of the frame. The footage showed Stewart coming into the frame being chased by defendant, Thomas, and Higgins. Stewart fell to the ground, and defendant began striking him. Thomas and Higgins immediately joined in, and the three men began to grab, hit, and kick Stewart. While Stewart was lying prone, Thomas mounted Stewart and began to choke Stewart and strike his face, while defendant kicked and stomped Stewart in the head.

¶ 24 According to Higgins, Thomas eventually lifted Stewart's head up and Higgins recognized Stewart as his cousin. He told defendant and Thomas to stop. Defendant stopped and began to walk away. Higgins followed defendant, while Thomas continued to choke Stewart for a few seconds. The surveillance footage showed the beating lasted approximately 27 seconds. Defendant's participation, during which he struck Stewart with his hands and feet several times, lasted approximately 21 seconds. The surveillance video also showed defendant was the first to begin walking away from Stewart, toward their vehicles on Chicago Avenue. Higgins believed

Stewart was still conscious when the beating stopped, agreeing that Stewart "was just a little beat up around the head."

¶ 25    Higgins testified the men did not speak while walking toward their vehicles. The surveillance camera on the Salvation Army building captured the men after they had returned to and entered the vehicles. The footage showed defendant pull the Suburban alongside Thomas's F-150 and stop for about five seconds, before driving north—in reverse—out of the frame. According to Higgins, the occupants of the two vehicles did not communicate while they were alongside each other. Thomas then turned his vehicle around and drove north on Chicago Avenue, out of the frame.

¶ 26    The surveillance camera from the SSA office continued to record Stewart's body as it lay motionless on Oak Street, near the apex of the intersection's northeast corner. About one minute and three seconds after the beating stopped, the Suburban—still in reverse—entered the frame. From the camera's vantage point, Stewart's body did not appear to make any movement during that time frame. Defendant backed the Suburban around the corner onto Oak Street, west of Stewart's body, facing east. He then drove forward, appearing to drive on the left side of the street. Higgins was not in position to see the Suburban as it passed Stewart's body, and he did not see the Suburban strike Stewart.

¶ 27    Three seconds later, Thomas's F-150 entered the frame and turned right onto eastbound Oak Street. According to Higgins, Thomas slowed down and aimed the F-150 at Stewart. Thomas then drove over and dragged Stewart's body to the dumpster. The footage showed the F-150 fishtailing as it dragged and disengaged the body. Higgins said to Thomas, "I know you didn't just run [Stewart] over." Thomas replied, "F*** that b*** a*** n***." Both vehicles turned left onto Greenwood Avenue and proceeded north.

7

¶ 28        Higgins told Thomas to take him home. Thomas, however, returned to his own residence with Higgins. When they arrived, they got into a Dodge Durango with two other men. Thomas told Higgins they were going to "drop something off," likely referring to a drug transaction, and then they would drop off Higgins at his home. Instead, they drove out to a property along the Kankakee River. Thomas shot Higgins six times at close range and left. Higgins spent days in the hospital and survived.

¶ 29        In the meantime, the police and paramedics were dispatched to the scene where Parnell and Stewart were located. Patrolman Levi Peters arrived and saw Parnell sitting on the sidewalk on the southwest quadrant of the intersection. Parnell's head was bleeding. Another patrolman tended to Parnell, and Parnell was transported to the hospital.

¶ 30        Peters also saw Stewart lying in the roadway on the northeast quadrant of the intersection, next to a dumpster. Stewart appeared to have suffered severe traumatic injuries—his body was contorted, he was bleeding, and he was nonresponsive and barely breathing. Stewart died before the ambulance arrived.

¶ 31                              2. *Stewart's Cause of Death*

¶ 32        Forensic pathologist Dr. Michel Humilier performed an autopsy on Stewart. His report was admitted into evidence. Stewart suffered multiple external injuries. He had a large laceration on the right side of his head, which exposed his skull. There were smaller lacerations near his right ear. He had other lacerations on his head, neck, right forearm, and behind his left knee. He had multiple abrasions on his head, neck, torso, and extremities. He also had bruises around both eyes. The autopsy did not reveal any evidence of strangulation.

¶ 33        Stewart also suffered several internal injuries. His thoracic spine, sternum, ribs, and left femur were fractured. His right elbow was dislocated. He had multiple lacerations on his lungs,

8

liver, and spleen. He also had multiple subgaleal hemorrhages, indicative of "blows to the head." Approximately 1.25 liters of blood (or about 25% of the blood in a human body) had accumulated in Stewart's chest and abdominal cavities. Stewart's lungs and kidneys were pale, suggesting they had lost blood.

¶ 34 Ultimately, Dr. Humilier concluded Stewart's cause of death was "multiple injuries" that "could be due to both physical and vehicular [assault] or either." Dr. Humilier agreed, however, that Stewart's internal injuries to his lungs, liver, and spleen were the most significant in terms of causing death. That is, the internal injuries were more likely to cause death than the external injuries.

¶ 35 *3. Evidence at the Scene*

¶ 36 Detective Jennifer Schoon arrived on scene shortly after the patrolmen. She observed Stewart's body lying near the dumpster and learned that Parnell had already been transported from the scene. Schoon recovered fragments of a broken New Amsterdam vodka bottle on the sidewalk and adjacent grass where Parnell had been located. Some of the fragments were bloody.

¶ 37 She also observed two pools of blood. One was on the surface of Oak Street, near the apex of the intersection's northeast corner. This pool of blood was located where the asphalt roadway transitioned to the concrete curbing. The second pool of blood was approximately 30 feet east on Oak Street, next to a dumpster.

¶ 38 *4. Defendant's Police Interview*

¶ 39 Schoon interviewed defendant on January 9, 2019. A portion of an audio-video recording of the interview was admitted into evidence and published to the jury. Defendant recounted his actions up to when he left the party. His summary of those actions was largely consistent with Higgins's testimony. However, defendant told Schoon he intended to visit a woman named

9

Shiann,[2] who lived on North Schuyler Avenue, when everyone left Williams's party to go to the bar. Defendant added that he was "drunk as hell," a fact he repeated frequently during the interview, and did not know whether he could make it safely to the bar. Defendant also told Schoon that Thomas had left, with several others, in the Durango. He denied seeing Thomas's F-150 at all that night.

¶ 40    Defendant's account of what transpired after he left the party evolved throughout the interview. At first, defendant told Schoon he left the party around 1:30 a.m. He went to Shiann's house directly and arrived at 1:40 a.m. He woke the next morning, went to Liddell's house, and got into an argument with Liddell about him having taken the Suburban. Defendant confirmed he knew Thomas had been arrested and was in jail for shooting Higgins. He heard Thomas and Higgins had been in an altercation with other people on Chicago Avenue. Defendant speculated Thomas may have thought Higgins was "gonna tell on" Thomas. In the ensuing days, defendant tried to keep his distance, because defendant thought people would assume he was involved due to his known, close friendship with Thomas.

¶ 41    When Schoon confronted defendant with the fact the Suburban was seen on surveillance footage near Chicago Avenue and Oak Street around that time, defendant told her the "whole night was a blur" and he was "very" or "belligerently" drunk. He expressed confusion as to why he would be there if he was heading to Shiann's house. Schoon then told defendant he had parked on Chicago Avenue, Thomas's F-150 parked behind him, and he then backed up and drove east on Oak Street. Defendant again said he did not remember being in the area or making those maneuvers. Schoon then asked defendant if he remembered running over a body on Oak Street, and defendant adamantly denied running over a body, something he would have remembered

_____

[2]Shiann's last name was not identified at trial.

because he would have felt a bump. He persisted in his denial even after Schoon told him she had seen him run over the body on video.

¶ 42 After Schoon told him that Thomas also ran over the body, defendant told Schoon the only reason he could have been in the area was the fight that Thomas got into on Chicago Avenue. Defendant then went further, admitting he saw an altercation between Thomas and others in that area. He maintained, however, that he was "just trying to leave" and "get to Shiann's house." He did not know Thomas was behind him when he left or that Thomas followed him as he went north on Greenwood Avenue. Defendant denied being involved in the fight.

¶ 43 Eventually, defendant told Schoon that he heard Thomas had been in an altercation with at least one of the victims during the party, though defendant did not see it occur. Defendant also told Schoon that he spoke to Thomas on the phone before the altercation at Chicago Avenue and Oak Street. Thomas told defendant that "he seen somebody he had got into it with." Defendant asked, "Where y'all at?" Thomas told him, "Chicago." Defendant thought it was going to be "a regular fight," but it got out of hand. When defendant saw a man lying on the sidewalk, not moving (presumably Parnell), he told Thomas to leave Stewart alone and said, "let's go." Defendant denied being involved in the fight, even when Schoon told him three men could be seen beating Stewart. Instead, defendant maintained he stood by the vehicles, "looking, making sure no police were coming and stuff." Schoon then asked defendant whether there would be any reason his DNA was on Stewart. Defendant responded, "All I tried to do was get [Thomas] off of [Stewart]," so they could leave the area.

¶ 44 At one point in the interview, Schoon asked defendant whether he was scared of "going back to prison." Though other portions of the recording had been redacted, this remark was not. Defendant made no objection when it was played for the jury.

11

¶ 45                    5. *Defendant's Phone Call to Liddell*

¶ 46        Three days later, on January 12, 2019, defendant called Liddell while he was incarcerated in the county jail. A recording of that phone call was admitted into evidence. During the call, Liddell mentioned hearing about murder charges. Defendant said, "I ran over the man's leg. That ain't kill him. That did not kill him."

¶ 47                    6. *Evidence Recovered From the Suburban*

¶ 48        Schoon located the Suburban in Hopkins Park. The Suburban was clean; the tires' sidewalls appeared clean and shiny. The F-150 was abandoned and burned with gasoline in Pembroke Township.

¶ 49        Sergeant Del Rio[3] processed the Suburban on January 10, 2019. He found receipts for dry cleaning and an oil change in the glove box, both with defendant's name on them. He also found vehicle registration, which stated the vehicle was registered to Liddell. He discovered blood on the steering wheel. Forensic biologist Heather Wright later determined the DNA profile extracted from the blood matched defendant's DNA profile.

¶ 50        Del Rio also inspected the Suburban's undercarriage. He discovered no blood but recovered a black fiber, which the parties stipulated did not come from Stewart's clothing. Del Rio could not tell whether the undercarriage had been recently washed because it was too rusty.

¶ 51                    7. *Trooper Verkler's Opinion*

¶ 52        Verkler testified that he met with Schoon around 9 a.m. on January 1. Schoon gave Verkler an overview before they went to view the scene. Schoon walked Verkler through the scene and told him what she had identified as potential evidence. Schoon pointed out tire marks, vehicle debris, and blood on both the northeast and southwest quadrants of the intersection. Schoon told

---

[3]Del Rio's first name was not identified at trial.

12

Verkler there were two victims and where those victims were located when police arrived the night before.

¶ 53    Verkler testified the case was called in as a pedestrian crash, which he understood to mean a moving vehicle striking two persons who were walking or standing. Thus, he was looking for signs of what he would expect to find in such a crash but found none. Instead, he found pooled blood in the northeast quadrant, and he found some blood and broken glass on the southwest quadrant. Verkler immediately realized the areas where the victims were located did not "line up to what [he] would expect to see from two people being struck by a motor vehicle."

¶ 54    Verkler ruled out Parnell having been struck by a vehicle and believed he was likely struck by the glass vodka bottle. As to Stewart, Verkler observed the pool of blood a few feet from the apex of the intersection's northeast corner. Between that pool of blood and the pool by the dumpster, Verkler observed scuff marks on the road, "some scrubbing of clothing," and a "couple different imprints of blood." He also observed a thin black tire mark on the curb next to the western pool of blood. He found no evidence relevant to Stewart west of the western pool of blood. Thus, he did not believe Stewart was originally struck by a vehicle. Rather, he concluded a vehicle hit Stewart while Stewart was lying on the ground and his body was dragged to the dumpster. Verkler believed the evidence was consistent with one vehicle striking Stewart.

¶ 55    Verkler noticed a camera mounted on the nearby SSA office. On January 2, Verkler went to the SSA office and asked to view the surveillance footage. After watching the footage, he concluded two vehicles struck Stewart.

¶ 56    During Verkler's testimony, the State again published the surveillance footage that had earlier been shown to the jury during Higgins's testimony. Verkler described what he saw as the jury watched. Defendant renewed the objection stated in his pretrial motion. Verkler testified there

13

was a white mark above Stewart's body as it was lying prone, before the Suburban drove past it. After the Suburban drove past Stewart's body, the white mark was no longer visible. In other words, "there [was] a change of the appearance of where Mr. Stewart is." Verkler described the change of appearance as a "change in the pixels in that area." In addition, he noted the video depicted "a little change in the suspension of the vehicle" as it drove past Stewart's body. Because the camera angle and lighting source remained constant, and because "the only source of motion coming through the frame [was] the vehicle," Verkler opined, the only thing that could have changed the position of Stewart's body was the Suburban.

¶ 57                               D. Jury Instructions Conference

¶ 58        During the jury instructions conference, several matters relevant to defendant's claims on appeal were discussed and others were not discussed. We provide basic information here and will provide additional facts in our analysis.

¶ 59                               1. *Accountability and Withdrawal*

¶ 60        On the issue of accountability, the State offered Illinois Pattern Jury Instructions, Criminal, No. 5.03 (approved Oct. 28, 2016) (hereinafter IPI Criminal No. 5.03). The court and the parties did not discuss supplemental paragraphs two and four of the instruction. See IPI Criminal No. 5.03, Committee Note. Relatedly, on the issue of withdrawal, the State offered IPI Criminal No. 5.04. The court gave both instructions over defendant's objection.

¶ 61                               2. *Causation*

¶ 62        Neither party offered Illinois Pattern Jury Instruction, Criminal, No. 7.15 (approved Apr. 26, 2019), which defines causation. The court did not give the instruction.

¶ 63                               3. *Concluding Instructions and Verdict Forms*

14

¶ 64    After discussion with the parties, the court also gave a concluding instruction that was based on Illinois Pattern Jury Instructions, Criminal, No. 26.01Q (4th ed. 2000) (hereinafter IPI Criminal 4th 26.01Q).

¶ 65                              E. Deliberations and Verdict

¶ 66    The jury began deliberating at 2:54 p.m. The jury sent three notes to the court. The third note, sent at 7:10 p.m., asked the court for "[c]larification on why there are two charges of murder" and asking whether "lead to death and cause of death" meant "the same thing." The court and the parties agreed to the following response to both questions: "you have heard and seen the evidence and been instructed as to the law. No further explanation can be given."

¶ 67    At 7:31 p.m., the jury returned a guilty verdict on both counts of first degree murder.

¶ 68                         F. Motion for New Trial and Sentence

¶ 69    Defendant filed a postjudgment motion. Among other things, defendant contended the trial court (1) should not have permitted Verkler to testify as to what he saw on the surveillance video, (2) should not have admitted the State's other-crimes evidence, (3) should not have given IPI Criminal No. 5.04 on the issue of withdrawal, and (4) should have given an aggravated battery instruction as a lesser-included offense of the vehicle strike count.

¶ 70    The court denied the motion. It merged the conviction on the physical beating count into the vehicle strike count and sentenced defendant to 45 years' imprisonment. The court denied defendant's motion to reconsider sentence, and this appeal followed.

¶ 71                                  II. ANALYSIS

¶ 72    On appeal, defendant raises several claims of error. Specifically, defendant contends (1) IPI Criminal 4th No. 26.01Q, as given, improperly instructed the jury that it could find the State proved that defendant committed both first degree murder and reckless homicide, even though those

offenses require inconsistent mental states; (2) the court erred by failing to give supplemental paragraphs two and four of IPI Criminal No. 5.03 and by giving IPI Criminal No. 5.04; (3) the jury heard improper evidence about defendant's criminal history and prior police contact; (4) the court improperly allowed the State's expert to testify as to what he observed on surveillance video; (5) the court erred by failing to give IPI Criminal No. 7.15 and by declining to answer the jury's question on whether "lead to death" and "cause of death" meant "the same thing"; and (6) the court abused its discretion in failing to give instructions on the lesser-included offense of aggravated battery. Defendant further argues that even if none of the purported errors alone is reversible, the errors' cumulative effect deprived him of a fair proceeding, warranting a new trial.

¶ 73    We begin with a jurisdictional issue.

¶ 74                    A. Jurisdiction to Consider Unsentenced Count

¶ 75    The trial court did not enter a sentence on the physical beating count because that count merged into the vehicle strike count. Defendant recognizes that in *People v. Relerford*, 2017 IL 121094, ¶ 75, the supreme court held this court lacks jurisdiction to consider the validity of unsentenced convictions. He nevertheless maintains there is authority—*People v. Lilly*, 56 Ill. 2d 493 (1974), and *People v. Fort*, 2019 IL App (1st) 170644—permitting us to address the physical beating count's merits. And if we were to do so, he asks that we also reverse his conviction on the physical beating count.

¶ 76    Except as provided by rule, this court's jurisdiction is limited to reviewing final judgments. Ill. Const. 1970, art. VI, § 6. A judgment does not become final in a criminal case until a sentence is imposed. *Relerford*, 2017 IL 121094, ¶ 71. Thus, this court has no jurisdiction to determine the validity of an unsentenced conviction. *People v. Jamison*, 2018 IL App (1st) 160409, ¶ 37.

16

¶ 77 Under *Relerford*, we lack jurisdiction to consider the physical beating count's merits, because that count was merged into the vehicle strike count and no sentence was entered on it. See *Relerford*, 2017 IL 121094, ¶ 75. We therefore reject defendant's suggestion that we may grant him relief on the physical beating count.

¶ 78 The authority defendant cites does not persuade us otherwise. In *Lilly*, the supreme court determined it had jurisdiction to consider an unsentenced conviction because the defendant had properly appealed from a final judgment on another offense. *Lilly*, 56 Ill. 2d at 496. Absent from the court's analysis, however, was any discussion of the *appellate court's* jurisdiction to review a nonfinal judgment. To the extent *Lilly* holds that *this court* may review an unsentenced conviction, we adhere to *Relerford*'s more recent and unmistakably clear holding to the contrary.

¶ 79 We decline to follow *Fort* to the extent it holds this court has jurisdiction to consider the merits of an unsentenced count. The partial dissent in that case adequately explains why the appellate court's exercise of jurisdiction under such circumstances was erroneous under *Relerford*. See *Fort*, 2019 IL App (1st) 170644, ¶¶ 41-49 (Connors, J., concurring in part and dissenting in part).

¶ 80 We turn now to defendant's claims as they relate to the vehicle strike count.

¶ 81                                 B. IPI Criminal 4th No. 26.01Q

¶ 82 Defendant first contends the trial court erroneously gave paragraph four of "IPI 26.01R," which is a concluding instruction that informs the jury how to fill out the verdict forms. See IPI Criminal 4th No. 26.01R.

¶ 83                          1. *The Instruction at Issue and the Parties' Positions*

¶ 84 After the court determined the jury would be instructed on lesser-included offenses for each murder count, the court and the parties discussed the correct instruction from the 2.01 and

17

26.01 series.[4] Trial counsel suggested IPI Criminal 4th Nos. 2.01Q and 26.01Q. The court redirected the parties to IPI Criminal 4th Nos. 2.01R and 26.01R. The State ultimately prepared the instruction, which read, in regard to the vehicle strike count, as follows:

"[4.] If you find the State has proved the defendant guilty of both first degree murder, and reckless homicide, you should select the verdict form finding the defendant guilty of first degree murder and sign it as I have stated. Under these circumstances, do not sign the verdict form finding the defendant guilty of reckless homicide.

[5.] Under the law, the defendant cannot be guilty of first degree murder and reckless homicide. Accordingly, if you find the defendant guilty of first degree murder, that verdict would mean that the defendant is not guilty of reckless homicide. Likewise, if you find the defendant guilty of reckless homicide, that verdict would mean that the defendant is not guilty of first degree murder." See IPI Criminal 4th No. 26.01R.

¶ 85    On appeal, defendant contends paragraph four of the instruction improperly informed the jury it could find defendant guilty of both first degree murder and reckless homicide, and if it did so, it should sign the verdict form for first degree murder. Defendant argues that because first degree murder and reckless homicide require inconsistent and mutually exclusive mental states, a person cannot be guilty of both offenses. Thus, defendant asserts, the instruction contained an erroneous statement of the law. Further, he maintains, the erroneous instruction left open the possibility at least one of the jurors found defendant acted recklessly, not intentionally or knowingly, but nevertheless signed the verdict form for first degree murder. Defendant

---

[4]The 2.01 and 26.01 series are related. The committee notes dictate that each 2.01 instruction has a corresponding 26.01 instruction, with the same letter identifier, that must be given. See IPI Criminal 4th No. 2.01, Committee Note; IPI Criminal 4th No. 26.01, Committee Note. For example, if 2.01Q is given, then 26.01Q must be given.

18

acknowledges he did not properly preserve this issue for review. He nevertheless maintains we may grant him relief either under the doctrine of plain error or via a finding of ineffective assistance of counsel.

¶ 86      The State concedes paragraph four of the instruction improperly stated the law but argues defendant is not entitled to relief. Specifically, the State maintains defendant did not just forfeit this issue; he invited the error when defense counsel stated she was "okay with [the instruction]." Thus, the State argues, defendant cannot obtain relief under the plain-error doctrine and is limited to a claim of ineffective assistance of counsel. And because defendant has not established prejudice, the State continues, defendant's claim fails.

¶ 87      We agree with defendant. Before beginning our discussion, we note the trial court incorrectly identified IPI Criminal 4th Nos. 2.01R and 26.01R as the proper instructions, which is a mistake the parties have repeated on appeal. Defense counsel was correct when she suggested that IPI Criminal 4th Nos. 2.01Q and 26.01Q should be used. Those instructions are to be used when, as here, the jury is to be instructed on one or more charges and lesser-included instructions are to be given for each charge. IPI Criminal 4th Nos. 2.01R and 26.01R, though similar, are to be given when the jury is to be instructed on one or more charges and lesser-included instructions are to be given on at least one but fewer than all of the charges. In any event, despite the incorrect identification, the instruction ultimately conformed with IPI Criminal 4th No. 26.01Q (notwithstanding the challenged paragraph). For the sake of clarity, we will refer to the challenged instruction by its correct identifier, IPI Criminal 4th No. 26.01Q.

¶ 88                          2. *The State Concedes the Instruction Was Erroneous*

¶ 89      To begin, we accept the State's concession that IPI Criminal 4th No. 26.01Q, as given, incorrectly stated the law because paragraph four should not have been included. "The function of

19

jury instructions is to provide the jury with accurate legal principles to apply to the evidence so it can reach a correct conclusion." *People v. Hartfield*, 2022 IL 126729, ¶ 51. The question—one of law subject to *de novo* review—is "whether the instructions, taken as a whole, fairly, fully, and comprehensively apprised the jury of the relevant legal principles." (Internal quotation marks omitted.) *Id.*

¶ 90        Here, the offense of first degree murder required proof that defendant either intended to cause death or great bodily harm or knew his acts carried a strong possibility of doing so. See 720 ILCS 5/9-1(a)(1)-(2) (West 2018). On the other hand, the offense of reckless homicide required proof that defendant acted recklessly (*id.* § 9-3(a)), which is a less culpable, and therefore inconsistent, mental state. See *People v. Eubanks*, 2019 IL 123525, ¶¶ 73-74, 77. Paragraph four of IPI Criminal 4th No. 26.01Q should not be used when, as here, the lesser offense requires a less culpable mental state than the greater offense; paragraph five should be given instead. See *People v. Towns*, 157 Ill. 2d 90, 110-11 (1993); see also IPI Criminal 4th No. 26.01Q, Committee Note (stating that paragraphs four and five are mutually exclusive and that paragraph four should not be given when the lesser offense involves a less-culpable mental state). Simply put, the jury could not, by definition, find the State proved defendant guilty of both first degree murder and reckless homicide in relation to the vehicle strike, and paragraph four of the instruction erroneously indicated to the jury that it could do so. See IPI Criminal 4th No. 26.01Q, Committee Note.

¶ 91                              3. *Defendant Forfeited His Claim*

¶ 92        We next turn to the issue of procedural default. As noted, the parties dispute the type of procedural default implicated here. Defendant asserts he forfeited his claim regarding IPI Criminal 4th No. 26.01Q and asks for relief either under the doctrine of plain error or as an ineffective-

20

assistance claim. The State urges us to go further and find defendant invited the error, which limits him to an ineffective-assistance claim.

¶ 93         The doctrines of forfeiture and invited error are distinct subtypes of procedural default. Forfeiture occurs when a party fails to timely assert a known right. *People v. Ratliff*, 2024 IL 129356, ¶ 26. At base, forfeiture is a product of inaction or passivity. See *People v. Childress*, 2024 IL App (4th) 240669-U, ¶¶ 22-23. The doctrine's purpose is to allow the trial court to correct errors before appeal and to keep a party from obtaining reversal through inaction. *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007). In the context of jury instructions, a party forfeits a claimed error when the party fails to (1) contemporaneously object or offer an alternative instruction and (2) raise the issue in a posttrial motion. *Id.*

¶ 94         Conversely, invited error is a product of an affirmative act. See *People v. Hollahan*, 2019 IL App (3d) 150556, ¶ 17, *rev'd on other grounds*, 2020 IL 125091; *Childress*, 2024 IL App (4th) 240669-U, ¶ 23. Under the invited-error doctrine, "an accused may not *request* to proceed in one manner and then later contend on appeal that the course of action was in error." (Emphasis added.) *People v. Carter*, 208 Ill. 2d 309, 319 (2003). The doctrine discourages duplicity and combats the manifest unfairness that would arise if a party were to obtain reversal based on the very error that party injected into the proceedings. *People v. Harvey*, 211 Ill. 2d 368, 385 (2004). We generally find invited error in cases where "a party *** ask[s] the court to commit the error or at least explicitly agree[s] to the commission of the error." *Childress*, 2024 IL App (4th) 240669-U, ¶ 23.

¶ 95         The distinction between forfeiture and invited error is critical because it dictates how a defendant may seek relief on the procedurally defaulted issue. See *People v. Brown*, 2023 IL App (4th) 220400, ¶ 31. If the error has been forfeited, then the defendant may seek relief either under the plain-error rule or by claiming ineffective assistance of counsel. See *People v. Jackson*, 2020

21

IL 124112, ¶¶ 90-91. If the error was invited, then plain-error review is unavailable; the defendant may only claim ineffective assistance. See *Brown*, 2023 IL App (4th) 220400, ¶ 31.

¶ 96    While discussing IPI Criminal 4th No. 26.01Q, defense counsel asserted paragraph four did not "seem quite right" because it "seem[ed] like you're telling the jury that they have to find him guilty of first degree murder if [it] also think[s] he's guilty of reckless homicide." Counsel noted that first degree murder and reckless homicide involve inconsistent mental states and contended the jury should not be told it could not find defendant guilty of reckless homicide under those circumstances. The court told counsel that the instruction was taken directly from the pattern jury instructions and was presumably correct. Counsel did not press the issue further. The court and parties then switched their focus to paragraph five. After the court noted changes would be made to that paragraph, counsel stated, "Okay. I got it now. I'm okay with it." As noted, the State prepared the instruction, including paragraphs four and five, and the court gave it. Defendant did not object to the final instruction or raise any issue with it in his posttrial motion.

¶ 97    Admittedly, this court has found invited error in another case where counsel made a similar statement to the trial court. See *Cholipski v. Bovis Lend Lease, Inc.*, 2014 IL App (1st) 132842, ¶ 63 (finding counsel's response of " '[o]kay' " was an "acquiesce[nce]" that waived the issue on appeal). The context of counsel's statement in this case, however, compels a finding of forfeiture and not invited error.

¶ 98    First, defendant did not offer the erroneous instruction. See *People v. Coan*, 2016 IL App (2d) 151036, ¶ 24 (declining to find invited error because the State, not the defendant, tendered the instruction); *cf. People v. Patrick*, 233 Ill. 2d 62, 77 (2009) (finding invited error when the defendant tendered the erroneous instruction). Rather, the court directed the parties to the instruction, and the State ultimately prepared the instruction, including the erroneous paragraph.

22

Second, while counsel did not use the words "object" or "objection," she voiced concerns about paragraph four's inclusion. The court nevertheless dismissed those concerns based on its understanding—contrary to established case law and the committee note—that paragraph four of IPI Criminal 4th No. 26.01Q must be given in these circumstances.

¶ 99 Under these circumstances, we decline to find counsel invited the error when she stated she was "okay with" IPI Criminal 4th No. 26.01Q, which had not yet been prepared and tendered by the State. Simply put, the concerns underlying the invited-error doctrine are not present here, and the record provides no basis to conclude defendant requested or explicitly agreed to paragraph four's erroneous inclusion.

¶ 100 Instead, the record shows the failure to preserve the issue was the result of counsel's passivity, and defendant forfeited the claim, for two reasons. First, counsel failed to press her concerns and did not clearly state an objection when the State tendered the final version of the instruction. Second, defendant failed to include the claim in his posttrial motion. See *Piatkowski*, 225 Ill. 2d at 564.

¶ 101 4. *The Erroneous Instruction Was Plain Error and Requires Reversal*

¶ 102 As a result of the forfeiture, defendant may establish he is entitled to relief under the plain-error rule. See *People v. Herron*, 215 Ill. 2d 167, 175-76 (2005); Ill. S. Ct. R. 451(c) (eff. Apr. 8, 2013) ("[S]ubstantial defects [in jury instructions] are not waived by failure to make timely objections thereto if the interests of justice require."). The plain-error rule is a narrow and limited exception which allows us to grant relief on forfeited issues in certain circumstances. *Herron*, 215 Ill. 2d at 177. Under the plain-error rule, the defendant must first establish there was a plain, that is, clear or obvious, error under current law. *People v. Givens*, 237 Ill. 2d 311, 329 (2010). Next, the defendant must establish either (1) the evidence was so closely balanced that the error alone

23

threatened to tip the scales against defendant (first-prong plain error) or (2) the error was so serious that it affected the trial's fairness and challenged the process's integrity (second-prong plain error). *Herron*, 215 Ill. 2d at 186-87.

¶ 103        We have already accepted the State's concession that the instruction was erroneous because paragraph four was included when it should not have been. And the State does not dispute the error was clear and obvious, with good reason. At the time of trial, settled law established paragraphs four and five of IPI Criminal 4th No. 26.01Q are mutually exclusive, and paragraph four should not be given when, as here, the lesser offense involves a less-culpable mental state. See *Towns*, 157 Ill. 2d at 110-11; IPI Criminal 4th No. 26.01Q, Committee Note; see also *Givens*, 237 Ill. 2d at 329 (a plain error is one which is clear or obvious under current law).

¶ 104        As the parties point out, paragraph five of IPI Criminal 4th No. 26.01Q was also included in the instruction, and it provided a correct statement of the law. Paragraph five informed the jury that if it found defendant guilty of first degree murder, that necessarily meant he was not guilty of reckless homicide, and vice versa. IPI Criminal 4th No. 26.01Q. In some instances, a correct instruction may cure an erroneous instruction. *Hartfield*, 2022 IL 126729, ¶ 59; see *People v. Dylan E.A.*, 2023 IL App (4th) 220503-U, ¶¶ 32-36 (finding no plain error where the jury was orally instructed with a correct statement of the law, then orally instructed with a directly conflicting, incorrect statement of the law, and then given a written instruction with a correct statement of the law); *People v. Darr*, 2018 IL App (3d) 150562, ¶¶ 84-85 (finding erroneous jury instruction was not second-prong plain error where it was given once, orally; was followed by numerous correct instructions as to the same element, both orally and in writing; correct written instructions were sent to the jury room; and the parties during closing emphasized the correct principles of law).

24

¶ 105    In other cases, a correct instruction may not cure a directly conflicting, erroneous instruction. For example, in *Hartfield*, the defendant was charged with armed robbery and four counts of aggravated discharge of a firearm. *Hartfield*, 2022 IL 126729, ¶ 1. The trial court provided the jury with a pattern instruction defining an element of aggravated discharge of a firearm. *Id.* ¶ 18. In response to a question from the jury about that element, the court answered with an erroneous statement of the law. *Id.* ¶¶ 22, 51-56. The jury found the defendant guilty of armed robbery and all four counts of aggravated discharge of a firearm. *Id.* ¶ 23.

¶ 106    The appellate court found the trial court's erroneous answer to the jury's question was not reversible error. *Id.* ¶ 27. The supreme court concluded otherwise, finding the erroneous answer was second-prong plain error. *Id.* ¶ 59. After discussing *People v. Jenkins*, 69 Ill. 2d 61, 66-67 (1977), which had reached the same conclusion, the court wrote the following:

"Whereas a single erroneous instruction might be cured by other instructions or by some other showing of a lack of prejudice, two directly conflicting instructions on an essential element, one stating the law correctly and the other erroneously, cannot be cured this way due to the simple fact that we can never know which instruction the jury was following. What is at issue with this error is the integrity of the judicial system itself. Thus, regardless of whether it is plain-error or harmless-error analysis, such an error is presumed to be prejudicial." *Hartfield*, 2022 IL 126729, ¶ 59.

Accordingly, the court reversed defendant's conviction without evaluating the trial evidence. *Id.* ¶¶ 61, 97.

¶ 107    In *People v. Woods*, 2023 IL 127794, ¶ 54, the supreme court clarified *Hartfield*'s scope. (*Woods* differed slightly from *Hartfield* in that the defendant in *Woods* preserved the issue for review.) The court explained that giving directly conflicting instructions is not always prejudicial.

*Id.* Rather, "directly conflicting instructions may be harmless when they do not concern a disputed essential issue in the case so that there is not a fear that the jury relied on the incorrect instruction." *Id.*

¶ 108      Under *Hartfield* and *Woods*, directly conflicting instructions may be but are not necessarily prejudicial. The critical question is whether the instruction was given on a disputed essential issue in the case such that there is a fear the jury relied on the incorrect instruction.

¶ 109      This case resembles *Hartfield*, and we conclude the erroneous instruction requires us to reverse the jury's verdict on the vehicle strike count. Like the instruction and answer to the jury's question in *Hartfield*, paragraphs four and five of the erroneous instruction here were in direct conflict. Paragraph five correctly instructed the jury that defendant could not be guilty of both first degree murder and reckless homicide. Paragraph four, however, implicitly authorized the jury to find both offenses simultaneously established, despite their incompatible mental-state requirements. See *Eubanks*, 2019 IL 123525, ¶¶ 73-74, 77; IPI Criminal 4th No. 26.01Q, Committee Note. By directing the jury to return a first degree murder verdict if it found *both* offenses proven, paragraph four presupposed the jury could, in fact, find both offenses simultaneously proven. In addition, if the jury found defendant acted recklessly and somehow also found he acted intentionally or knowingly, "it would be error for the court to tell the jury to *** return a guilty verdict on [first degree murder]." IPI Criminal 4th No. 26.01Q, Committee Note.

¶ 110      While the jury signed the verdict form for first degree murder, we cannot know whether the jury unanimously found defendant acted intentionally or knowingly. Due to the erroneous instruction, it is possible that one (if not more) jurors concluded defendant acted recklessly and the remaining jurors concluded he acted intentionally or knowingly. The instruction directed the jury to reconcile such a conflict by signing the guilty verdict form for first degree murder. By directing

26

the jury toward that verdict, the instruction (1) foreclosed the jury's ability to resolve the mental-state issue independently and (2) masked whether the jury ever reached a true consensus. In other words, the instruction not only misled the jury but also undermined the jury's deliberative process.

¶ 111    Additionally, the directly conflicting instructions concerned a disputed essential issue in the case. The State's theory at trial was that the physical beating and vehicle strikes were part of one continuous attack (even though it charged them as two separate acts) and that defendant was accountable for all of Thomas's acts against Stewart. Defendant's theory at trial was that he participated intentionally in the aggravated battery, completed that offense, and acted recklessly when (if at all) he struck Stewart with the Suburban, and that Thomas's vehicle strike was a separate offense for which he was not accountable.

¶ 112    When it gave the lesser-included instructions, the trial court inherently recognized there was at least some evidence from which the jury could accept defendant's theory. See *People v. Sloan*, 2024 IL 129676, ¶ 15 (noting a jury instruction should be given when there is some evidence to justify the instruction). Based on the evidence discussed above, we agree with the court's assessment.

¶ 113    Thus, defendant's mental state—an essential element of the charge presented to the jury—was in dispute. See *People v. Cunningham*, 2019 IL App (1st) 160709, ¶ 28 (noting the State must prove beyond a reasonable doubt every element of the offense, including the required mental state). While IPI Criminal 4th No. 26.01Q did not define an element of the offense (*cf. Hartfield*, 2022 IL 126729, ¶¶ 18, 22), it was a critical instruction that directed the jury on what to do once it resolved a disputed essential issue in the case. See *Jenkins*, 69 Ill. 2d at 66-67 (noting erroneous instructions which "define[ ] the issues in the case or [are] mandatory in character" cannot be cured by giving a directly conflicting instruction). That is, it implied the jury could find defendant acted

27

both recklessly and intentionally or knowingly and that if it did, it should nevertheless find defendant guilty of first degree murder. This erroneous instruction prevented the jury from performing its most essential function: determining defendant's guilt or innocence as to the charged offense. See *Hartfield*, 2022 IL 126729, ¶ 58 (citing *Jenkins*, 69 Ill. 2d at 66).

¶ 114    The State does not dispute that paragraphs four and five of the instruction directly conflicted, paragraph four stating the law incorrectly and paragraph five correctly. Nor does it dispute the instruction concerned a contested essential issue in the case. Instead, the State contends the error was harmless because the jury also found defendant guilty of the physical beating count. The jury's finding on the physical beating count, the State argues, "reveal[s] that [the jury] acted in a logical and legally consistent manner."

¶ 115    We reject the State's reliance on the unsentenced conviction as to the physical beating count. As noted above, the physical beating count is not properly before us because no sentence, and thus no final judgment, was entered on it. See *Relerford*, 2017 IL 121094, ¶ 75 (appellate court lacks jurisdiction to decide validity of unsentenced convictions). It would be inappropriate and inequitable to allow the State to use an unsentenced conviction to defeat defendant's claim as to the vehicle strike count when defendant is jurisdictionally barred from challenging his unsentenced conviction. Moreover, the State presents no authority for its position that a nonfinal, unsentenced conviction may be used in such a manner. The State chose to charge the physical beating and vehicle strikes as separate offenses, and under the circumstances, the validity of the vehicle strike conviction must be evaluated independently.

¶ 116    Finally, we find the State's reliance on *Towns* unpersuasive. In *Towns*, the court ultimately concluded the purportedly erroneous instruction correctly stated the law under the unique circumstances of the case. *Towns*, 157 Ill. 2d at 111. The State, however, has conceded paragraph

four of IPI Criminal 4th No. 26.01Q was an incorrect statement of law, and it does not dispute the instruction provided inconsistent statements of law—one correct and the other incorrect—concerning a disputed essential issue in the case.

¶ 117    In such circumstances, "the jury cannot perform its constitutional function." *Jenkins*, 69 Ill. 2d at 66; accord *Hartfield*, 2022 IL 126729, ¶¶ 58-59. It is the trial court's duty to give the jury proper guidance, and it cannot delegate that function to the jury by supplying it with two directly conflicting instructions. See *Jenkins*, 69 Ill. 2d at 66-67. Because we do not know whether the jury followed the correct or incorrect instruction, we must reverse defendant's conviction on the vehicle strike count.

¶ 118                                              C. Remedy

¶ 119    If defendant had not also been found guilty of the physical beating count, our reversal would be accompanied by a remand with directions to hold a new trial on the vehicle strike count. In such a case, we might also address some of the other issues raised by defendant, if we found them likely to recur. See *Pielet v. Pielet*, 2012 IL 112064, ¶ 56; *People v. Hari*, 218 Ill. 2d 275, 299-302 (2006); *Hana v. Illinois State Medical Inter-Insurance Exchange Mutual Insurance Co.*, 2018 IL App (1st) 162166, ¶ 27.

¶ 120    But this is not such a case. As noted, the jury found defendant guilty of both counts. The court merged the physical beating count into the vehicle strike count and imposed only one sentence. Generally, when the trial court merges one conviction into another, that conviction is, in effect, vacated. *People v. Betance-Lopez*, 2015 IL App (2d) 130521, ¶ 61. However, neither a merger nor this court's judgment in a successful appeal affects veracity of the unsentenced conviction. See *People v. Bryant*, 2021 IL App (3d) 190530, ¶ 17. In such cases, the unsentenced conviction may be reinstated and a sentence may be imposed. See *id.*

¶ 121      The parties do not ask us to direct the trial court to hold a new trial on the vehicle strike count. Nor do they ask us to direct the court to impose a sentence on the physical beating count. Instead, they simply ask that we remand the case "for further proceedings."

¶ 122      Accordingly, we decline to address the other issues raised by defendant, even those that might recur during a new trial on the vehicle strike count. Because the parties have not specified how they wish to proceed on remand, addressing defendant's remaining claims would require us to speculate that they will proceed on a new trial on that count. This is so because the court could impose sentence on the unsentenced conviction, at which point defendant could appeal. See *People v. Henry*, 2025 IL App (3d) 230137, ¶ 51 (remanding for sentencing on two counts that merged into convictions that were vacated on appeal); *Bryant*, 2021 IL App (3d) 190530, ¶ 17 (same); see also *People v. Monroy-Martinez*, 2024 IL App (1st) 221684-U, ¶ 33 (vacating aggravated kidnapping conviction and sentence and "remand[ing] for entry of a conviction and sentencing" on a second count that merged into the aggravated kidnapping conviction). As such, any discussion of those issues would be advisory. See *Pielet*, 2012 IL 112064, ¶¶ 55-56; *People v. Stitts*, 2020 IL App (1st) 171723, ¶ 33 (declining to address additional issue where discussion would amount to an advisory opinion).

¶ 123                           III. CONCLUSION

¶ 124      For the reasons stated, we reverse the trial court's judgment and remand for further proceedings.

¶ 125      Reversed and remanded.

*People v. Hale*, 2025 IL App (3d) 220510

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kankakee County, No. 20-CF-429; the Hon. William S. Dickenson, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Santiago A. Durango, and Steven Varel, of State Appellate Defender's Office, of Ottawa, for appellant. |
| **Attorneys for Appellee:** | James Rowe, State's Attorney, of Kankakee (Patrick Delfino, Thomas D. Arado, and Nicholas A. Atwood, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |